PEOPLE v ROGERS

Docket No. 228929. Submitted May 7, 2001, at Detroit. Decided December
28, 2001, at 9:10 A.M.

Rebecca Y. Rogers was bound over to the Oakland Circuit Court with
regard to five counts of practicing a health profession without a
license, MCL 333.16294. The defendant moved to quash the infor-
mations, alleging that the definition of "practice of medicine" in
MCL 333.17001(1)(d) is void for vagueness because it encompasses
constitutionally protected conduct and speech and is so broad that
it fails to provide guidelines for law enforcement personnel. The
court, Deborah G. Tyner, J., granted the motion on the ground that
the statute is overbroad on its face and contains within its sweep
constitutionally protected speech. The prosecution appealed.

The Court of Appeals *held*:

1. A criminal defendant generally may not defend on the basis
that the charging statute is unconstitutionally vague or overbroad
where the defendant's conduct is fairly within the constitutional
scope of the statute. However, where First Amendment rights are
involved, the overbreadth doctrine provides an exception to the
general rules of standing and permits the defendant to challenge
the constitutionality of a statute on the basis of the hypothetical
application of the statute to third parties not before the court.

2. Facial overbreadth challenges to a statute may be entertained
where the statute attempts to regulate by its terms only spoken
words, attempts to regulate the time, place, and manner of expres-
sive conduct, or requires approval by local functionaries with
standardless, discretionary power.

3. When a statute regulating both speech and conduct is chal-
lenged, the overbreadth of the statute must not only be real, but
substantial as well, judged in relation to the plainly legitimate
sweep of the statute.

4. A statute may be saved from being found to be facially invalid
on overbreadth grounds where it has been or could be afforded a
narrow and limiting construction by the state's courts or where the
unconstitutionally overbroad part of the statute can be severed.

5. Michigan courts have considered the problem of the over-
breadth of the statute and afforded it a narrow and limiting con-

struction. The statute, so construed, does not apply to the speech identified by the defendant as wrongfully abridged. To the extent that the statute, so limited, might reach constitutionally protected speech or conduct, the overbreadth is not substantial judged in relation to the plainly legitimate sweep of the statute, and there is no realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court. The facial challenge to the statutory definition of "practice of medicine" must fail.

6. The relevant statutes do not confer unfettered discretion on law enforcement officials to determine when the statutes have been violated, and the statutes are not vague.

Reversed and remanded.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *David G. Gorcyca*, Prosecuting Attorney, *Joyce F. Todd*, Chief, Appellate Division, and *Janice A. Kabodian*, Assistant Prosecuting Attorney, for the people.

*Hertz, Schram & Saretsky, P.C.* (by *Walter J. Piszczatowski* and *Michael J. Rex*), for the defendant.

Before: WHITE, P.J., and CAVANAGH and TALBOT, JJ.

WHITE, P.J. The prosecution appeals as of right the circuit court's order granting defendant's motion to quash informations charging her with five counts of practicing a health profession without a license, MCL 333.16294. The circuit court concluded that the statutory definition of "practice of medicine," MCL 333.17001(1)(d), was facially overbroad and reached a substantial amount of constitutionally protected speech. We reverse and remand.

I

Testimony at the preliminary examination included that of Sue Wrubel, who took her then eighteen-

month-old son, Shane, to see defendant on November 3, 1999, on a friend's recommendation. A medical doctor had recommended to Wrubel that Shane get tubes in his ears and Wrubel was interested in a nonsurgical solution to Shane's ear problems. Wrubel understood defendant was an alternative practitioner.

Defendant's office was located in the basement of her home in Berkley. Defendant came in and hooked Shane to a machine. Wrubel could not recall if defendant told her the name of the machine because Shane was upset and crying. Shane remained in Wrubel's lap after he was connected to the machine and, after Shane had calmed down, Wrubel and defendant talked about Shane's ear problems and defendant's qualifications.

Wrubel testified that defendant told her that she was a medical doctor and had obtained the highest degree of natural doctoring. Wrubel did not examine the many certificates lining defendant's walls, but was impressed by them and interpreted them to mean that defendant was demonstrating how qualified she was. Wrubel did not recall defendant explaining that she was a naturopathic medical doctor, but admitted defendant may have told her this. Wrubel admitted that she assumed that defendant was a natural doctor as opposed to a medical doctor. Wrubel did not recall defendant explaining about the different meridians of the body, about biofeedback, or about electromagnetics. Defendant tried to answer Wrubel's questions and to be helpful.

Once the machine finished, defendant told Wrubel that Shane had a tapeworm, a bacteria that was probably causing his earaches, and a brain aneurysm. Wrubel was surprised by this news because she believed

Shane was just experiencing earaches and thought that the machine was reading her because Shane was sitting on her lap. At Wrubel's request, defendant hooked her up to the machine. Wrubel looked at the computer screen and observed a column of diseases or conditions next to a column of numbers, but the screen did not indicate if the condition or disease was present. When the machine finished, defendant informed Wrubel that she had breast cancer, ovarian cancer, and a brain aneurysm, which was not unusual because aneurysms are generally hereditary. Wrubel was shocked to learn that she had cancer. Although Wrubel agreed that defendant told her that her and Shane's problems existed on a molecular level, Wrubel did not know what this meant. Wrubel looked up the definition of molecular when she went home, and she determined it meant "minuscule."

Wrubel purchased remedies from defendant, because defendant told her the remedies would cure her cancer and Shane's ailments. Wrubel paid over $500 for the visit and for the remedies, did not recall signing a consent form at defendant's office, and did not ask if defendant accepted insurance or otherwise inquire about payment at the time she made the appointment. Wrubel admitted that defendant did not force her to purchase the remedies and that she wanted to follow the program suggested by defendant. Although Wrubel did not take any of the remedies, she did give them to Shane.

After Wrubel told her husband about the visit to defendant, he called defendant and asked for a refund. Defendant agreed to refund the purchase price for any unopened remedies. After unsuccessfully attempting to get a full refund, Wrubel's husband

contacted the state for assistance in getting a refund and to determine if defendant was a doctor.

Kimberley Wiegand also testified during the preliminary examination. She stated that she went to her first appointment with defendant on December 20, 1999. Wiegand had been diagnosed as having symptoms of multiple sclerosis (MS) for nine years. Wiegand's symptoms first became evident when she began tripping, and ultimately, the entire right side of her body became numb and she required a leg brace. Since she had been diagnosed, Wiegand had seen a number of neurologists and received no treatment because she was told there was no cure for MS.

A friend recommended that Wiegand see defendant and made it clear that defendant was an alternative practitioner. Wiegand was interested in seeing defendant because defendant was not another neurologist, and Wiegand hoped that defendant could offer her something different than what had been offered by traditional medicine. When Wiegand called to make the first appointment, she believed that the receptionist told her the visit would not be covered by insurance, and Wiegand did not expect insurance to cover her visit to defendant because she knew the treatment focused on vitamins and different remedies. Wiegand's husband accompanied her on her visits to defendant's office because she required assistance walking.

In Wiegand's opinion, visiting defendant's office was unlike a visit to a typical doctor's office because there were comfortable chairs, no medical instruments or equipment, she was not required to remove her clothes, and her medical history was not taken. Defendant's assistant hooked Wiegand up to a ma-

chine by attachments secured with Velcro to her ankles, middle fingers, wrists, and head. Wiegand was hooked up to the machine for approximately forty minutes, during which time defendant came downstairs and talked with her. Defendant told Wiegand that she had been a nurse at a hospital cancer ward and was an M.D., which Wiegand interpreted to mean medical doctor. Defendant also gave Wiegand a business card and pointed out the M.D. on the card. Wiegand was shown defendant's business card at the preliminary examination, and she admitted the card stated that defendant was an "N.M.D." Wiegand did not know what the N represented, but she recalled defendant telling her she was a naturopathic practitioner. Wiegand also specifically recalled that defendant told her that she was an M.D. and not an N.M.D. Wiegand believed that defendant was a doctor on the basis of defendant's representations that she had been a nurse and was an M.D. Although Wiegand was looking for something different than traditional medicine and the naturopathic or homeopathic aspect of defendant's treatment interested her, she was also impressed that defendant had been a nurse and was an M.D. According to Wiegand, defendant talked a lot, responded helpfully to her questions, and appeared to be trying to educate her.

Defendant informed Wiegand that she did not have MS, but had a bacteria in her body. Defendant told Wiegand that her numbers were high and she needed to bring the numbers down. Wiegand was excited to learn that she did not have MS and to find someone who could help her. Defendant informed Wiegand that if she took all the remedies suggested by defendant, it would take one month for every year that Wiegand

had been diagnosed as having MS to clear up the bacteria causing Wiegand's problems. Wiegand could not recall the specific terms defendant used in explaining how the remedies would affect her body and just recalled that she was supposed to be "one hundred percent" in nine months, meaning that she would no longer have to wear a leg brace and the bacteria would be gone. Defendant also told Wiegand to jump on a trampoline and to lymphasize with a massager in order to unblock her lymph nodes. Wiegand jumped on a trampoline by holding onto her husband and lymphasized faithfully every day with a massager. Wiegand purchased the remedies from defendant, which defendant had in her office, and paid approximately $550 for this first visit and the remedies.

On January 18, 2000, Wiegand had a second appointment with defendant. Wiegand was again hooked up to the machine and defendant examined Wiegand's numbers and told Wiegand that five of her ailments, including a gall stone, inflamed appendix, inflamed small intestine, and inflamed large intestine, had been cured and that she was doing better in a number of areas. After examining the numbers on the machine, defendant prescribed a few different things, took a couple of things away, and ultimately added four more remedies.

Wiegand explained that defendant had told her that she should start noticing some small improvements or progress within a week, and Wiegand was concerned because a month had passed since her first appointment and she had noticed no improvement. Defendant reiterated that it would take one month for each of the nine years that Wiegand had been diagnosed with MS for her to heal. Again, defendant thoroughly

answered Wiegand's questions, did not appear to be withholding information, and appeared willing to spend a lot of time with Wiegand.

Wiegand paid approximately $1,265 for the two appointments and treatment and went to defendant's house in between the two appointments to procure additional remedies. Wiegand canceled her third appointment with defendant, scheduled for the middle of March 2000, after she learned of the charges against defendant.

Michigan State Police Detective Trooper Brian Davis of the Diversion Investigation Unit was referred to the Wrubels in January 2000 by the State Bureau of Health Services. Davis testified during the preliminary examination that, after contacting the Wrubels regarding their experience with defendant, he posed as a patient with lower back trouble and made an undercover visit to defendant's office with Detective Trooper Kelly Feever on February 7, 2000.[1]

Davis described the machine he was connected to as computer-driven with electronic leads connected to another electronic device. Defendant's assistant told Davis that the machine was a Phazx biofeedback machine, registered with the Food and Drug Administration (FDA) as a class two, noninvasive device. Davis subsequently confirmed that that information was correct.

Defendant introduced herself as "Dr. Rogers" and was wearing what appeared to be medical scrubs embroidered with "Dr. Rebecca Rogers, N.M.D." Davis' visit lasted over two hours, and he was told

---

[1] Feever recorded the visit except for the last few minutes, because the tape ran out.

not to speak while he was hooked to the machine. Defendant voluntarily told Davis that she had been in the medical field in the past, was disappointed with the level she had been in, and wanted to increase her level. Defendant told Davis that she had applied to be a doctor at a holistic hospital, but was denied employment. Defendant made reference to seeing a judge, who advised her that she had to be an M.D. Defendant explained that because it would be easier to obtain her M.D. than to change the law, she went back to school and procured an M.D. At one point, defendant said she was a naturopathic M.D. Defendant also initiated a conversation about the problems with the practice of medicine today. According to defendant, the practice of medicine relied on excessive prescription drug use that caused cancer, and defendant stated that the real cause of cancer had been discovered by a man who was arrested by the FDA because it did not want the cure released.

After approximately twenty minutes, defendant removed the Velcro straps from Davis and asked Feever to slide around the desk so she could see what the screen indicated about Davis' condition. Defendant's primary conclusion was that Davis' stomach, liver, and pancreas were in precancerous states. The computer screen listed the diseases or ailments in one column, next to another numeric column that indicated the particular organ's condition. Defendant explained that a number above ten thousand indicated an active cancerous state while a number below ten thousand indicated a cancerous state in its infancy. After explaining that as an N.M.D. she could not tell Davis that she could cure him, defendant told

Davis that she could tell him that she builds immune systems and rids the body of toxins.

Defendant recommended a four-step treatment plan and told Davis that the remedies would eliminate the toxins in his body that were causing his problems and would cure Davis' problems. This treatment plan consisted of (1) consuming a proper diet, (2) drinking plenty of water, (3) taking the remedies purchased from defendant on that day, and (4) lymphasizing. Defendant explained that lymphasizing involved unclogging clogged lymph nodes in order to allow the body to rid itself naturally of toxins, and that lymphasizing could be done by massage with an electronic massager or by jumping on a trampoline for ten minutes three times a day. Davis claimed that defendant told him that he would be cured in four months provided he followed this treatment plan and he purchased the remedies from defendant.

Defendant had Davis sign a consent form, which was used to refresh his recollection at the preliminary examination and read into the record. It stated as follows:

> It is not her capacity nor her intent to diagnose or treat specific diseases. It is her intention to assist the body to rid itself of toxins and correct chemical imbalances in order to activate the immune system.

Davis requested a search by the Bureau of Health Services to determine whether defendant was licensed in a medical field in Michigan and received a certificate of nonlicensure under seal from the bureau indicating that defendant was not licensed to practice in any medical field in Michigan. Davis testified that

Michigan does not license the practices of naturopathy and homeopathy.

On March 2, 2000, defendant was arrested on two complaints alleging three counts of unauthorized practice of medicine for her treatment of Davis, Sue Wrubel, and Shane Wrubel. On the same day, Davis obtained a warrant to search and seize defendant's property, including all certificates, diplomas, degrees, awards, or other documentation indicating correspondence training or education received by defendant in any care field or any health care related practices. Davis testified that he did not seize any of defendant's certificates or diplomas because none of them indicated that defendant was a medical doctor or had attended a medical school. Davis testified that he had no notes or records of what defendant's formal education was. Defendant's entire house was searched, the Phazx machine was seized, and one computer was seized from defendant's bedroom. Davis testified that he did not determine whether defendant was trained in the operation of the Phazx machine. Davis testified that he checked into the nature of the remedies defendant administered and that the FDA opined that defendant was legally selling dietary supplements.

Regarding defendant's education, Davis testified that he did not talk to defendant after her arraignment, but that a Detective Sergeant Larson did and defendant told Larson that she had a federal license issued from the Department of Health in the District of Columbia. Neither Davis nor Larson checked whether defendant in fact had been issued a federal license because they felt it was irrelevant.

On March 14, 2000, two complaints and two warrants were issued charging two additional counts of unauthorized practice of medicine against defendant arising out of her treatment of Wiegand on two occasions.

II

The examining magistrate found that there was probable cause to believe that defendant engaged in the unauthorized practice of medicine and bound defendant over for trial on all five counts without addressing defendant's constitutional challenges.[2]

The parties stipulated to consolidate the cases for trial. Defendant moved to quash the informations, alleging that the definition of "practice of medicine" in MCL 333.17001(1)(d) is void for vagueness and overbroad because it encompasses conduct and speech protected under the First and Fourteenth Amendments of the United States Constitution and because it is so broad that it provides no guidelines to law enforcement personnel. Defendant's motion

---

[2] The magistrate noted:

[T]he Court finds that there is probable cause to believe that the defendant did practice medicine and did so without a license from the state of Michigan. It's clear to the Court that the actions of the defendant constituted the practice of medicine in as much as she used a machine to quote "to diagnose particular problems," that she—that she sold various tablets, what they contained the Court has not been presented with any evidence, what those tablets were designed to do was to alleviate the problem which is the same thing as cure the problem whether you call it cleansing the system, whether you call it clearing the problem, it all amounts to a treatment, a diagnosis and treatment, and a prescribed remedy for that treatment, all of which the defendant had no license in the state of Michigan as based upon the evidence presented today . . . .

included the following argument regarding over-breadth:

> More importantly, the statute directly impinges on the exercise of free speech. MCL § 33317001 [sic] dictates, under threat of criminal prosecution, a complete ban on speech that relates to health issues in any degree. Under this statute individuals must remain silent regarding physical or mental complaints voiced by other human beings.
>
> The statute not only precludes the unlicenced [sic] diagnosis and treatment of disease, acts which would be commonly associated with the practice of medicine in everyday usage, but even the unlicenced [sic] offer of advice to someone as to the means for preventing or relieving any physical or mental complaint. Thus, the athletic team trainer who proposes a series of stretches to be performed prior to an athletic event is effectively offering advice to prevent injury or "defect" (i.e., a pulled muscle). Similarly, the motivational speaker who offers suggestions for overcoming apathy is offering advice to prevent or relieve a mental condition and, unless licensed by the state, is unlawfully engaged in the "practice of medicine" as defined in MCL § 3317001 [sic].
>
> The First Amendment implications of the statute are real and substantial. The statute's proscription clearly reaches, in addition to the examples already cited, the elementary school teacher instructing students on health and hygiene, as well as any publication that addresses any manner of physical health or emotional well being. The statute totally criminalizes and thus discourages the *speaking* about health issues. It discourages completely the sharing of knowledge about such issues.
>
> As such, the criminal statute at issue is unconstitutional on its face, being both void for vagueness and overbroad.

In response to defendant's motion to quash, the prosecution argued that defendant had not satisfied her burden of overcoming the presumption that the statute is constitutional; that defendant's vagueness

challenge "must focus on the facts of the case at hand to determine whether the statute, as applied to her facts, is unconstitutionally vague"; and that defendant's conduct clearly falls within the ambit of the statute. Regarding defendant's overbreadth challenge, the prosecution argued that the doctrine should be applied sparingly and only as a last resort; that the statute is not substantially overbroad because it seeks "to regulate conduct, rather than pure speech"; and that defendant lacked standing to challenge the statute on overbreadth grounds because her own conduct clearly fell within the conduct sought to be prohibited by the statute:

> [T]he Defendant's conduct is exactly the type of conduct the statute sought to prohibit. She held herself out as a licensed medical doctor, used a machine to render a diagnosis of various diseases, and advised her patients of a plan of treatment which would cure them of those diseases. The statute is clearly not overbroad when applied to the facts of this case.[3]

The prosecution attached to its response a copy of the Bureau of Health Services "Certification of Non-Licensure," which stated that the licensure records of all health profession boards in Michigan had been searched and no record of a professional license being issued in the name of Rebecca Yevette Rogers was found to practice in the professions of "Chiropractic, Dentistry, Marriage & Family Therapy, Medicine, Nursing, Optometry, Osteopathic Medicine, Occupational Therapy, Physician's Assistant, Pharmacy, Physical Therapy, Podiatric Medicine, Psychol-

---

[3] Citations to the preliminary examination transcript are omitted.

ogy, Counseling, Sanitarian, or Veterinary Medicine" pursuant to 1978 PA 368, as amended.

At the conclusion of the hearing, the circuit court stated:

> The Defendant was bound over on a finding that she used a machine to diagnosis [sic] particular problems and sold various tablets designed to alleviate or cure the problems.
>
> The Court noted that whether you call it cleansing the system, whether you call it clearing the problem, it all amounts to a diagnosis and treatment and a prescribed remedy for that treatment: page 117, 118, of the preliminary exam transcript.
>
> The Defendant was bound over for her conduct, not speech. However, when making overbreadth challenge [sic], defendant may rely on the rights of hypothetical third persons and may obtain a declaration that the statute is unconstitutional without showing that the conduct in which she is engaged is constitutionally protected. *Woll* versus *Kelly* (phonetic), 409 Mich 500 at 534.
>
> There must be a realistic danger that the statute itself was significantly compromised, recognized First Amendment protections of parties not before the Court, for it to be facially challenged on overbreadth grounds. *Township of Plymouth* versus *Paul Hancock*, 236 MichApp [sic] 197, at 202.
>
> In this case, MCL 333.17001(1)(D) [sic] includes in its definition of "practice of medicine," the quote, diagnosis, treatment, prevention, care or relieving of a human disease, ailment, defect, complaint, other physical or mental condition by advice, device, diagnostic test or other means or offering, or holding oneself out as able to do any of these acts, end quote.
>
> This statute's broad definition of practice of medicine, including the giving of advice, would have a significant chilling effect on the free dissemination of ideas of social and political significance, namely discussions relative to alternatives to traditional medical care or nutrition or health matters in general.

> Applying the real and substantial test, this Court finds this statute is overbroad on its face and that it contains within in its sweep, constitutionally protected speech.

This appeal ensued.

III

A

The statute under which defendant was charged, MCL 333.16294, proscribes the unauthorized practice of a health profession:

> Except as provided in section 16215,[4] an individual who practices or holds himself or herself out as practicing a health profession[5] regulated by this article without a license or registration or under a suspended, revoked, lapsed, void, or fraudulently obtained license or registration, or outside the provisions of a limited license or registration, or who uses as his or her own the license or registration of another person, is guilty of a felony.

The "practice of medicine" is defined in MCL 333.17001(1)(d):

> "Practice of medicine" means the diagnosis, treatment, prevention, cure, or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition, by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding oneself out as able to do, any of these acts.

---

[4] Section 16215, MCL 333.16215, addresses the subject of licensees delegating the performance of certain acts to others and is not relevant here.

[5] "Health profession" is defined in MCL 333.16105(2) as "a vocation, calling, occupation, or employment performed by individuals acting pursuant to a license or registration issued under this article." "Health occupation," on the other hand, is defined as "a health related vocation, calling, occupation, or employment performed by individuals whether or not licensed or registered under this article." MCL 333.16105(1).

MCL 333.16171 provides exceptions to the require-
ment of a license to practice a health profession.[6]

[6] MCL 333.16171 provides:

Under the circumstances and subject to the limitations stated in
each case, the following individuals are not required to have a
license issued under this article for practice of a health profession
in this state:

(a) A student in a health profession training program, which has
been approved by the appropriate board, while performing the
duties assigned in the course of training.

(b) An individual practicing a health profession in the discharge
of official duties while in the military service of the United States,
the United States public health service, the United States depart-
ment of agriculture, or the United States veterans administration
. . . .

(c) An individual who by education, training, or experience sub-
stantially meets the requirements of this article for licensure while
rendering medical care in a time of disaster or to an ill or injured
individual at the scene of an emergency.

*(d) An individual who provides nonmedical nursing or similar
services in the care of the ill or suffering or an individual who in
good faith ministers to the ill or suffering by spiritual means
alone, through prayer, in the exercise of a religious freedom, and
who does not hold himself or herself out to be a health pro-
fessional.*

(e) An individual residing in another state or country and author-
ized to practice a health profession in that state or country who, in
an exceptional circumstance, is called in for consultation or treat-
ment by a health professional in this state.

(f) An individual residing in another state or country and author-
ized to practice a health profession in that state or country, when
attending meetings or conducting lectures, seminars, or demonstra-
tions under the auspices of professional associations or training
institutions in this state, if the individual does not maintain an
office or designate a place to meet patients or receive calls in this
state.

(g) An individual authorized in another country to practice a
health profession and who is employed by the United States public
health service or the government of another country for the exclu-
sive use of members of its merchant marine and members of its
consular and diplomatic corps, while caring for those members in
the performance of his or her official duties.

(h) An individual residing adjacent to the land border between
this state and an adjoining state who is authorized under the laws
of that state to practice a health profession and whose practice

B

This Court reviews de novo a trial court's determination regarding the constitutionality of a statute. *People v Jensen (On Remand)*, 231 Mich App 439, 444; 586 NW2d 748 (1998). This Court ordinarily reviews for an abuse of discretion a trial court's resolution of a motion to quash; however, because here the trial court's resolution involved a constitutional question, our review is de novo.

It is well established that a state can legitimately impose broad regulations on the practice of medicine through its police powers to protect the health, safety, and welfare of its citizens. *Goldfarb v Virginia State Bar*, 421 US 773, 792; 95 S Ct 2004; 44 L Ed 2d 572 (1975).

Statutes are presumed to be constitutional and must be so construed unless their unconstitutionality is readily apparent. *People v Hayes*, 421 Mich 271, 284; 364 NW2d 635 (1984). In determining whether a statute is unconstitutionally vague or overbroad, a reviewing court should consider the entire text of the statute and any judicial constructions of the statute. *Kolender v Lawson*, 461 US 352, 355; 103 S Ct 1855; 75 L Ed 2d 903 (1983). There are three grounds for challenging a statute for vagueness: (1) the statute is

---

may extend into this state, but who does not maintain an office or designate a place to meet patients or receive calls in this state.

(i) An individual authorized to practice a health profession in another state or territory of the United States who has been appointed by the United States olympic committee to provide health services exclusively to team personnel and athletes registered to train and compete at a training site in this state approved by the United States olympic committee or at an event conducted under the sanction of the United States olympic committee. [Emphasis added.]

overbroad and impinges on First Amendment freedoms, (2) the statute fails to provide fair notice of the proscribed conduct, and (3) the statute is so indefinite that it confers unfettered discretion on the trier of fact to determine whether the law has been violated. *Woll v Attorney General*, 409 Mich 500, 533; 297 NW2d 578 (1980); *Plymouth Charter Twp v Hancock*, 236 Mich App 197, 200-201; 600 NW2d 380 (1999). The circuit court quashed the information on the ground of overbreadth.

Generally, a criminal defendant may not defend on the basis that the charging statute is unconstitutionally vague or overbroad where the defendant's conduct is fairly within the constitutional scope of the statute. *People v Higuera*, 244 Mich App 429, 441-442; 625 NW2d 444 (2001). This rule of standing is relaxed when First Amendment rights are involved. Recognizing that the "First Amendment needs breathing space," the overbreadth doctrine permits litigants "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v Oklahoma*, 413 US 601, 611-612; 93 S Ct 2908; 37 L Ed 2d 830 (1973); *In re Chmura*, 461 Mich 517, 530; 608 NW2d 31 (2000). As such, the overbreadth doctrine is an exception to the general rules of standing that permits a defendant to challenge the constitutionality of a statute on the basis of the hypothetical application of the statute to third parties not before the court. *Broadrick, supra* at 612. Facial overbreadth challenges to statutes have been entertained where a statute (1) attempts to regu-

late by its terms only spoken words, (2) attempts to regulate the time, place, and manner of expressive conduct, or (3) requires official approval by local functionaries with standardless, discretionary power. *Id.* at 612-613.

When a statute purporting to regulate both speech and conduct is challenged, the "overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615; *Woll, supra* at 536. In *Los Angeles City Council v Taxpayers for Vincent,* 466 US 789, 800; 104 S Ct 2118; 80 L Ed 2d 772 (1984), the United States Supreme Court explained that the "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." Rather, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Id.* at 801.

A statute may be saved from being found to be facially invalid on overbreadth grounds where it has been or could be afforded a narrow and limiting construction by state courts or if the unconstitutionally overbroad part of the statute can be severed. *Broadrick, supra* at 613; *Woll, supra* at 539.

C

Defendant correctly observes that the statutory definition of "practice of medicine" is broadly worded. The scope of the definition's reach has, however, been limited by the Supreme Court in cases interpret-

ing predecessor statutes[7] of MCL 333.17001(1) and 333.16294. In a number of cases, the Supreme Court, citing *Locke v Ionia Circuit Judge*, 184 Mich 535, 539; 151 NW 623 (1915), has noted that exceptions to the definition of "practice of medicine" for "gratuitous and humane acts of relief and kindness," have been judicially engrafted. See *People v Banks*, 236 Mich 8, 14-15; 209 NW 935 (1926), *People v Sekelyn*, 217 Mich 341, 343; 186 NW 479 (1922), and *People v Watson*, 196 Mich 36, 39; 162 NW 943 (1917).

The statute at issue in *Locke, supra* at 539, defined the "practice of medicine" nearly identically to the current definition in MCL 333.17001(1)(d) (quoted above):

> In this act, unless otherwise provided, *the term 'practice of medicine' shall mean the actual diagnosing, curing or relieving in any degree, or professing or attempting to diagnose, treat, cure or relieve any human disease, ailment, defect or complaint, whether of physical or mental origin, by attendance or by advice, or by prescribing or furnishing any drug, medicine, appliance, manipulation or method, or by any therapeutic agent whatsoever.* [1899 PA 237, as amended by 1913 PA 368 (emphasis added).]

In *Locke, supra* at 539, the Supreme Court noted that the statutory definition of "practice of medicine" would reach "numerous gratuitous and humane acts

---

[7] Our search yielded only one case involving prosecution for the unauthorized practice of medicine under the present form of MCL 333.16294, and it did not involve constitutional challenges. In *People v Stiller*, 242 Mich App 38; 617 NW2d 697 (2000), this Court affirmed the defendant's convictions of second-degree murder and unauthorized practice of medicine where the defendant, who was licensed to practice medicine in Indiana but did not hold a valid medical license in Michigan, prescribed three drugs to a thirty-five-year-old patient who had a history of arrhythmia and whom the defendant had treated for years, and there was expert testimony that the patient died of mixed-drug intoxication.

of relief and kindness to the suffering common
amongst mankind in all ages and places," but, never-
theless, set aside the trial court's order quashing an
information charging a man with holding himself out
as a chiropractor and illegally practicing medicine:

> The substance of the attack upon this information is that
> it rests upon amendments to the act of 1899, passed with-
> out changing the original title, which provide for licensing
> persons desiring to practice a system of treatment of
> human ailments without resort to drugs, medicine, or sur-
> gery, subjecting them to the punishment provided in said
> act for practicing medicine without a license, and in the
> concluding paragraph essays to stamp them beyond ques-
> tion as medical practitioners by coining the following
> definition:
>
> "In this act, unless otherwise provided, the term 'practice
> of medicine' shall mean the actual diagnosing, curing or
> relieving in any degree, or professing or attempting to diag-
> nose, treat, cure or relieve any human disease, ailment,
> defect or complaint, whether of physical or mental origin,
> by attendance or by advice, or by prescribing or furnishing
> any drug, medicine, appliance, manipulation or method, or
> by any therapeutic agent whatsoever."
>
> *This sweeping effort at definition, with all provisions
> "otherwise" taken into account, would render criminal
> numerous gratuitous and humane acts of relief and kind-
> ness to the suffering common amongst mankind in all
> ages and places.* The police power of the State, though
> comprehensive, is scarce adequate to compass the possibili-
> ties of such a definition . . . . [*Id.* at 538-539 (emphasis
> added).]

In *Watson, supra,* the defendant challenged the suf-
ficiency of the information charging a violation of the
statute as amended in 1913. The information, in
effect, simply charged that the defendant practiced
medicine without a license. The Supreme Court
reversed the holding of the trial court and concluded

that the information was insufficient because (1) it did not set forth all the accusations necessary to constitute the offense, (2) it did not set forth any of the descriptive words used by the amended statute to define the offense, and (3) "a person may innocently do things embraced within the definition given in the statute." *Watson, supra* at 37. The Court explained that the prior statute left it to the courts to define piecemeal what was the practice of medicine, and that the 1913 amendment provided a legislative definition. The Court quoted the new statutory definition of "practice of medicine" and stated:

> Here are the elements of the statute offense, a catalogue of the acts constituing [sic] "practice of medicine," the doing of which makes the actor liable to the statute penalty. Under such an act, to charge one generally with "practicing medicine" is not to sufficiently charge him with a wrongful act. *Moreover, as will be pointed out, the foregoing statute definition is itself limited by the title of the act and the measure of the police power of the State.* Some things within this statute category may be innocently done. [*Id.* at 38-39 (emphasis added).]

The Court then quoted from *Locke, supra,* as quoted above, and concluded:

> It will be at once perceived that the information before us may or may not charge respondent with committing an offense, in view of the definition of "practice of medicine" found in the act and the proper scope of the act, as evidenced and limited by its title; *because, since the act has been sustained as valid upon certain limitations of the definition,* it is no longer sufficient to charge one with engaging in the business of practicing and with practicing medicine, contrary to the provision of the statute—*the law having been held valid only when applied to such acts enumerated therein as "in common acceptation and as gener-*

*ally construed by the courts" are regarded as engaging in the "practice of medicine." [Id.* at 40 (emphasis added).]*

In *Sekelyn, supra,* the Court reviewed a challenge to the jury instructions. The trial court had instructed the jury using the statutory definition of the "practice of medicine." The *Sekelyn,* Court, *supra* at 343, quoted *Locke, supra,* and noted that "it has been said that some things within this statute category may be innocently done," citing *Watson, supra.* The *Sekelyn* Court concluded that the jury instruction on the practice of medicine should have included "the exceptions made in the cases cited," but concluded that the error was harmless.

*Banks, supra,* cited *Locke, supra,* without discussion.[8] However, the concurring opinion in *Banks,* signed by four justices, noted:

> I concur, understanding that we adhere to what was said in *Locke* [*supra*], relative to gratuitous and humane acts of relief and kindness to the suffering. All persons may still, through humanitarian, as distinguished from professional impulse, *in back-stoop talkativeness, front-porch conversation and elsewhere, tell of cures and remedies and think and speak of a specific for an ailment without becoming criminals by virtue of this law.* This statute does not interdict the spirit of the "Good Samaritan;" neither does it outlaw "Mothers in Israel" or others, whose unselfish ministrations in a humanitarian sense, and not as professionals serving for a fee, alleviate pain and help hurts. [*Banks, supra* at 14-15 (Wiest, J., concurring, with whom Justices Snow, Clark, and McDonald concurred).]

---

[8] The lead opinion in *Banks,* signed by all eight justices, concluded that there was sufficient evidence to support Banks' conviction of practicing medicine without a license.

As noted above, a statute may be saved from being found to be facially invalid on overbreadth grounds where it has been or could be afforded a narrow and limiting construction by state courts. *Broadrick, supra* at 613; *Woll, supra* at 539. While none of these cases involved a direct constitutional challenge, it is clear that the Court considered the problem of the overbreadth of the statute and responded by affording it a narrow and limiting construction.

The exceptions judicially engrafted in *Locke, supra,* and its progeny limit the sweep of the statute. So construed, the statute does not apply to the speech identified by defendant as wrongfully abridged.[9] To the extent the statute, so limited, might reach constitutionally protected speech or conduct, the overbreadth is not substantial judged in relation to the plainly legitimate sweep of the statute, *Broadrick, supra* at 615-616, and there is no realistic danger that the statute, so limited, will itself significantly compromise recognized First Amendment protections of parties not before the Court, *Taxpayers for Vincent, supra* at 800-801.[10]

---

[9] We recognize that the prosecution did not rely on this argument below or direct the circuit court's attention to the cases discussed here. Nor are the cases cited on appeal. However, this Court is obliged to construe the statute in a constitutional manner, if possible. See *Gora v Ferndale,* 456 Mich 704, 719-723; 576 NW2d 141 (1998).

[10] Our conclusion is supported by decisions from other jurisdictions that, although not binding, may be considered. *Adams Outdoor Advertising v East Lansing,* 439 Mich 209, 234, n 43; 483 NW2d 38 (1992). While the statutes the constitutionality of which were upheld in the following cases are arguably less broad than the statute involved here, the narrowing construction placed on the Michigan statute by the Supreme Court renders the other statutes comparable.

In *People v Ray,* 119 Ill App 3d 180; 456 NE2d 179 (1983), the defendant was convicted of the unauthorized practice of medicine, following an undercover reporter's investigation of the defendant's business. *Id.* at 180-181. At the first visit to the defendant, the reporter was required to fill out

two forms, one of which stated that the defendant did not diagnose or prescribe. In response to the reporter's complaint about headaches, the defendant felt her head and told her that the bones of her skull did not fit together properly and she required cranial manipulation that could not be accomplished until her body was cleansed. *Id.* at 181. The defendant also told her that the roof of her mouth was too low, which is a common cause of headaches, that she had poor circulation, and suggested an herb for each of the glands and organs of the body. *Id.* at 181-182. The defendant gave the reporter a list of herbs and the reporter paid the defendant's assistant $20. *Id.* On the reporter's next visit to the defendant, she brought a state investigator and, posing as husband and wife, they observed the defendant examining and treating a number of individuals. *Id.* at 182.

The statute defining the practice of medicine and proscribing the unauthorized practice of medicine stated, in pertinent part:

"If any person holds himself out to the public as being engaged in the diagnosis or treatment of ailments of human beings; or suggests, recommends or prescribes any form of treatment for the palliation, relief or cure of any physical or mental ailment of any person with the intention of receiving therefor, either directly or indirectly, any fee, gift, or compensation whatsoever; or diagnosticates or attempts to diagnosticate, operate upon, profess to heal, prescribe for, or otherwise treat any ailment, or supposed ailment, of another; or maintains an office for examination or treatment of persons afflicted, or alleged or supposed to be afflicted, by any ailment; or attaches the title Doctor, Physician, Surgeon, M.D., or any other word or abbreviation to his name, indicating that he is engaged in the treatment of human ailments as a business; and does not possess a valid license issued by the authority of this State to practice the treatment of human ailments in any manner, he shall be sentenced as provided in Section 35.1." [*Id.* at 182, quoting Ill Rev Stat 1979, ch 111, par 4459.]

In rejecting the defendant's overbreadth challenge, the Illinois Court of Appeals noted that the Illinois Supreme Court had previously construed this statute as being constitutional and emphasized that the elements of the statute required

"a holding out to the public as being engaged in the diagnosis or treatment of ailments of human beings, the suggesting, recommending or prescribing treatment for relief of ailments, all with the intention of receiving either directly or indirectly a fee or reward therefor." [*Id.* at 184, quoting *People v Zimmerman*, 391 Ill 621, 623; 63 NE2d 850 (1945).]

The court concluded that the statute, by its terms and as previously interpreted, applied to the practice of medicine in the treatment of ailments and, when read in its entirety, did not regulate protected speech. *Id.* at

185. Moreover, the court noted that even if the statute marginally "infringe[d] on" protected expression or speech, it was narrowly tailored to effectuate the state's compelling interest in regulating the practice of medicine. *Id.* at 185.

In *People v Jeffers*, 690 P2d 194, 195 (Colo, 1984), the defendant was convicted of the unauthorized practice of medicine and challenged the statutory scheme defining the practice of medicine as unconstitutionally overbroad. The defendant operated a clinic called the General Orthotherapy Clinic. An undercover detective posing as a patient visited the defendant's clinic complaining of groin problems and general malaise. *Id.* After asking the detective about his medical history, the defendant examined the detective, diagnosed him with diverticulitis, recommended he undergo a series of colonic irrigation treatments, and charged him $35 for the visit. *Id.* at 196. Colo Rev Stat 12-36-106(1)(b) (1978) defines the practice of medicine as

> [s]uggesting, recommending, prescribing, or administering any form of treatment, operation, or healing for the intended palliation, relief, or cure of any physical or mental disease, ailment, injury, condition, or defect of any person with the intention of receiving therefore, either directly or indirectly, any fee, gift, or compensation whatsoever . . . [*Jeffers, supra* at 197, n 5.]

The statute has a number of exceptions, including for gratuitous rendering of services in emergencies, the practice of religious worship, and the rendering of services by an athletic trainer, subject to certain conditions.

The court concluded that the defendant did not have standing to challenge the statute as overbroad:

> In the past, both this court and the United States Supreme Court have permitted challenges to the facial overbreadth of laws that may have a chilling effect upon freedom of expression, even though such laws could be constitutionally applied to the parties asserting the challenge. [Citing *Broadrick, supra,* and other cases.] The rules of standing, however, are expanded only cautiously and in exceptional cases:
>
> "[F]acial overbreadth adjudication is an exception to our traditional rules of practice and . . . its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. . . . To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." [Quoting *Broadrick, supra* at 615.]

Here, the statute under attack is a criminal statute that deals exclusively with harmful, constitutionally unprotected conduct, and has no discernible effect on speech or expression. Pursuant to its police power, Colorado may define and regulate the practice of medicine and may prohibit unlicensed individuals from providing medical treatment. The practice of medicine itself is not protected by the first amendment. Therefore, reasonable regulation of medical practice does not conflict with first amendment protections. The unlawful practice of medicine statute thus has a broad, legitimate scope. In contrast, we have not been able to discern any specific overbroad applications, substantial or otherwise, that this statute may have. Under these circumstances, we refuse to consider the hypothetical chilling effect this statute may have in unknown future cases. [*Jeffers, supra* at 197-198 (citations omitted).]

In *State v Hoffman*, 733 P2d 502, 503 (Utah, 1987), the defendant appealed his conviction of the unauthorized practice of medicine, a third-degree felony, arguing that the act was unconstitutionally broad and void for vagueness, among other things. At issue was Utah's statute Utah Code Ann 58-12-28(4) (1953, 1986 repl), which defined the "practice of medicine" as encompassing:

"(a) to diagnose, treat, correct, advise, or prescribe for any human disease, ailment, injury, infirmity, deformity, pain or other condition, physical or mental, real or imaginary, or to attempt to do so by any means or instrumentality;

"(b) to maintain an office or place of business for the purpose of doing any of the acts described in Subsection (a) whether or not for compensation;

"(c) to use, in the conduct of any occupation or profession pertaining to the diagnosis or treatment of human diseases or conditions in any printed material, stationery, letterhead, envelopes, signs, advertisements, the designation 'doctor,' . . . unless the designation additionally contains the description of the branch of the healing arts for which the person has a license." [*Hoffman, supra* at 504, n 3.]

The Utah statute contains various exceptions, including: permitting "an individual to administer or advise 'a domestic or family remedy' except for prescription drugs," *id.* at 505, n 5; individuals rendering aid in an emergency when no fee is involved; persons engaged in the sale of vitamins, health foods, dietary supplements, and herbs not otherwise prohibited; and persons acting in good faith for religious reasons, as a matter of conscience, or based on a personal belief, when obtaining or providing any information regarding health care. The defendant contended that the definition of "practice of medicine" was unconstitutionally overbroad because it outlawed "home remedies, private inquiries, and advice about one's general health and condition." *Id.* at 505. The court, after noting that

We conclude that defendant's facial challenge to the statutory definition of "practice of medicine" fails.

---

the defendant's brief did not distinguish between vagueness and overbreadth and argued only the latter, rejected that challenge as well:

> Legislative enactments are accorded a presumption of validity. In considering a challenge to the overbreadth of a law, the law must be shown to reach a substantial amount of constitutionally protected conduct. If it does not, the challenge will fail. *State v Murphy*, 674 P2d 1220, 1222 (Utah 1983). The right to practice medicine, to diagnose maladies, and to prescribe for their treatment is not constitutionally superior to the state's power to impose comprehensive and rigid regulations on the practice. Defendant has not shown and cannot show that a criminal violation of the Act by the unlicensed prescription of treatments and cures to the gullible and unwary public for compensation rises to the level of a constitutionally protected activity. *State v Hoffman* [558 P2d 602 (Utah, 1976)] [*Bd. of Medical Examiners v Blair*, 57 Utah 516; 196 P 221 (1921)]; *People v Jeffers*, 690 P2d 194 (Colo 1984).
>
> The State claims that defendant lacks standing to raise this issue because his conduct proven at trial is clearly within a narrow, constitutional construction of the statute. *State v Jordan*, 665 P2d 1280, 1284 (Utah 1983). Essentially, defendant purports to assert the rights of unknown third persons who might prescribe such domestic or home remedies, generally offering advice as to another's health.
>
> The constitutionality of a statute is considered in light of the standing of the plaintiff who raises the question and of its particular application in his case. The plaintiff may challenge its validity only to the extent the alleged basis of its infirmity is, or will be, applied to his detriment. Defendant did not render gratuitous advice regarding a "domestic" or "over-the-counter" remedy and may not avail himself of the argument that the statute improperly might prohibit others from such conduct. His opinion and advice to the complainant, for which he was paid, could not be construed as the equivalent of an innocuous suggestion that she "go home and rest" or "take an aspirin."
>
> Therefore, because defendant's conduct is clearly within a narrow constitutional construction of the statute's prohibition intended by our legislature, he may not be heard to complain that the statute is overbroad so as to prohibit conduct that is not applicable to the facts of his case. Having engaged in conduct not constitutionally protected, defendant is not entitled to assert a constitutional claim that might be argued by someone else who prescribes domestic or family remedies. [*Id.* at 505-506 (some citations omitted).]

IV

Defendant also asserts that the statute is overbroad because it "infringes on the rights of citizens to make their own medical choices by eliminating all citizen health care options not sanctioned by licensed physicians" and because it impinges on defendant's right to pursue a lawful profession. Defendant, however, presents no authority in support of the proposition that the state may not regulate or prohibit the conduct alleged here.

V

Lastly, we address defendant's vagueness challenge. A statute may be challenged for vagueness when it fails to provide notice of the proscribed conduct or when it confers unfettered discretion to those charged with its enforcement to determine if the statute has been violated. *Hancock, supra* at 200. Defendant challenges the statute on the second basis.[11]

The statutory scheme defining the practice of medicine and proscribing the unauthorized practice of medicine does not confer unfettered discretion on law enforcement officials to determine when it has been violated. As construed, the statute does not, as defendant asserts, make "every day [sic] speech by persons and conduct in all sorts of occupations and callings subject to criminal prosecution." The statute itself defines the offending conduct in clear and understandable terms.

Reversed and remanded.

---

[11] Defendant seems to concede, and we conclude, that the statute provided sufficient notice to her that the conduct charged is criminal.