143 P.3d 618 (2006)
STATE of Washington, Respondent,
v.
PACIFIC HEALTH CENTER, INC., a Washington for-profit corporation; Pacific Health Center Spokane, Inc., a Washington for-profit corporation; and Monte Kline, individually and on behalf of his marital community, as President and Secretary of Pacific Health Center, Inc. and Pacific Health Center Spokane, Inc., Appellants.
No. 56886-8-I.
Court of Appeals of Washington, Division 1.
September 25, 2006.
*619 William R. Bishin, Seattle, for Appellants.
Paula Lillian Selis, Cheryl Deshon Kringle, Katherine M. Tassi, Attorney General's Office, Seattle, Richard A. McCartan, Melissa A. Burke-Cain, Attorney General's Office, Olympia, for Respondent.
*620 AGID, J.
¶ 1 The trial court granted the State's motion for partial summary judgment, ruling that the defendants violated the Consumer Protection Act (CPA) because their alternative health care practice, based primarily on electrodermal testing, constituted the unlicensed practices of medicine, naturopathy, and acupuncture. The defendants appealed both the trial court's ruling and the penalty it imposed, arguing the award was excessive.
¶ 2 We agree with the trial court's ruling that, although the defendants use alternative practice methods and terminology, their actual practices fall under the statutory definitions of medicine, naturopathy, and acupuncture. But practicing any of these disciplines without a license is not a per se CPA violation. The State failed to prove defendants did not have the level of competence they represented to the public or that any member of the public was even potentially injured by their actions. As such, the State did not prove a violation of the Act. Because the State did not prove defendants violated the CPA, the trial court also erred in imposing penalties under that statute. We affirm in part and reverse in part.

FACTS
¶ 3 Monte Kline and his close corporation, Pacific Health Center (PHC), have operated a health care practice in Washington for over 15 years. They advertise through brochures, radio, the internet, and seminars. Their practice consists primarily of using electrodermal testing (EDT) to detect imbalances in "Qi", the Oriental medicine concept of energy flow in the body.[1] Essentially, EDT uses a computerized, signal-emitting galvanic skin response (GSR) device to measure changes in electrical conductance at acupuncture points on a person's hands. Based on the imbalances detected during EDT, PHC employees recommend and provide various remedies including dietary changes, nutritional supplements, homeopathic mixtures and herbs.
¶ 4 On the opening page of their website, PHC asks "Are you sick & tired ... of being sick & tired?" They claim they can help with a variety of conditions, including candida, high cholesterol, allergies, and immune deficiencies. They describe EDT as follows:
This revolutionary analysis technique ... was pioneered by renowned West German physician, Reinhold Voll, M.D. in 1953. Various methods of Electrodermal Testing are currently used by over 40,000 medical doctors in Europe and by an increasing number of health practitioners in the United States.
Electrodermal Testing involves taking simple, painless, electrical resistance readings on the surface of the skin at acupuncture points on the finger. The subtle differences in the electrical resistance detected by the sophisticated testing instrument determines specifics such as nutrient deficiencies, food and environmental sensitivities, toxicities, energetically weak organs....
... adding to the circuit homeopathic dilutions of various foods, environmental substances, nutrients, toxins, etc. [to] change the skin resistance readings, indicating a `yes' or `no' relative to a particular test. These filters, originally in test vials, are now recorded electronically in the computer for simpler testing.
The computerized Electrodermal Testing allows the practitioner to test vitamins, minerals, enzymes, herbs, and homeopathic remedies for their "balancing effect" on the body, measured by their improving previously poor test readings. Thus, the guesswork of nutritional programs is eliminated.
Electrodermal Testing has been described as a method of "conducting an electronic interview with the human body." Not too unlike the electronic measurements of Dr. McCoy of "Star Trek" fame, we believe Electrodermal Testing is the health care of the 21st century.
PHC offers a money-back guarantee. They also provide clients a form called a "Superbill" *621 that lists various "Diagnostic Categories" including allergy, P.M.S., fibromyalgia and multiple vitamin deficiencies.
¶ 5 PHC's radio program, seminars, and website expressly state that Kline is not a physician or naturopath and that his Ph.D. and expertise are in holistic nutrition.[2] They provide prospective clients with a letter stating that PHC is a "non-medical, complementary health practice" which primarily uses EDT, which "measures the body on a different level than conventional medicine tests[.]... It is considered an investigational technology.... We encourage our clients to have regular physical examinations and appropriate conventional tests from their medical doctor." At the first appointment, the client signs a disclosure/authorization form stating that the Food and Drug Administration (FDA) has not approved the GSR device to assess "nutritional deficiencies, food allergies, the presence of toxins, Candida, Epstein-Barr virus, or weakness of organs or glands."[3] It also states:
I understand that the staff of Pacific Health Center are not medical or naturopathic physicians. I understand that Electrodermal Testing does not fall under state licensure requirements, and the staff of [PHC] function as nutritional consultants, as allowed by law. I do not seek nor have the [PHC] staff offered medical diagnosis, cure, advice, or treatment for any particular disease[,] ailment, injury, infirmity, deformity, pain, or other physical or mental condition. I understand that [PHC] staff will not administer or prescribe any drugs or medicinal preparations. Rather, I understand this program focuses on building health through nutritional balancing, desensitization and detoxification.[4]
No one at PHC holds any Washington health practice licenses.
¶ 6 The State began an action against PHC and Kline on September 29, 2003, alleging violations of the Consumer Protection Act, chapter 19.86 RCW, in three separate counts. Count one alleged appellants made unsubstantiated claims about what EDT could do, count two alleged they misled the public into thinking they were physicians practicing medicine, and count three alleged that the GSR device was deceptive because the FDA had not approved it for their chosen use. On February 7, 2005, the Department of Health (DOH) alleged in an administrative action that PHC and Kline engaged in the unlicensed practices of medicine, naturopathy, and acupuncture. On March 1, 2005, the State amended its complaint to delete the FDA-related count and add three new CPA counts, one for each of appellants' alleged unlicensed practices. DOH's administrative action was stayed, and on August 10, 2005, DOH filed an action for injunctive relief in Superior Court.
¶ 7 After the trial court consolidated the State and DOH actions, the State moved for partial summary judgment on the three alleged unlicensed practice-related CPA violations. At the hearing on the State's motion, the State said it was not asking the court to decide whether EDT was a valid modality, but only whether appellants were practicing medicine, naturopathy, and/or acupuncture. The court granted the motion, ruling that appellants violated the CPA by engaging in the unauthorized practices of medicine, naturopathy and acupuncture. The trial judge specifically found a violation of the CPA based on the Bowers decision.[5] She said her ruling was a narrow one:
I didn't think there were any factual questions as to what the practices of the defendants were. So there [were] no factual questions. The sole question that came before me today is: Are those practices then required to be licensed under the statute? And the three statutory provisions that the State cited were ones, as we all know, governing certain practices, either of medicine, naturopathic medicine or *622 acupuncture. I found those acts, as a matter of law, fall under those statutes. I didn't go further than that. And I honestly don't know what's left of the complaint.
She "found as a matter of law, because of the type of practices, that it was a violation of the Consumer Protection Act. We did not go any further than that in making any determination or assessment about the validity or treatments of these tools or modalities."[6] The court granted injunctive relief enjoining appellants' unlawful actions, but permitted appellants to operate as nutritionists as allowed under RCW 18.138. It ordered a civil penalty of $1 million and restitution in the amount of $701,630.11.[7] On November 29, 2005, the court entered a final judgment amount of $1,997,011.40, including civil penalties, restitution, costs and attorney fees.

DISCUSSION

I. Practice of Medicine, Naturopathy, and/or Acupuncture[8]
¶ 8 We review summary judgment orders de novo, making the same inquiry as the trial court.[9] Summary judgment is proper only when there is no genuine issue about any material fact, and the moving party is entitled to a judgment as a matter of law.[10] We consider all facts and reasonable inferences in the light most favorable to the nonmoving party.[11] Questions of fact may be determined as a matter of law when reasonable minds can reach only one conclusion.[12]
¶ 9 The first question this court must answer is whether PHC practices medicine, naturopathy, and/or acupuncture as the Washington Legislature has defined those professions. Statutory interpretation and the question whether a statute applies to a particular set of facts are issues of law we review de novo.[13] When interpreting statutes, our primary goal is to ascertain and give effect to legislative intent.[14] We begin with the statute's plain language and ordinary meaning, but also look to "the applicable legislative enactment as a whole, harmonizing its provisions by reading them in *623 context with related provisions and the statute as a whole."[15] If the statute remains susceptible to more than one reasonable meaning, it is ambiguous and we may resort to construction aides.[16]
¶ 10 In Washington, anyone practicing medicine, naturopathy, or acupuncture must have a valid current license.[17] DOH may obtain an injunction preventing a party from practicing without a license.[18] To determine whether PHC's practice falls under any or all of the three licensed practices at issue, we have to determine what EDT is and how PHC uses it. Like the trial court, we do not reach the merits of EDT as a health care modality, but instead only consider whether PHC's practice falls under the statutes.
¶ 11 A client's initial appointment takes about an hour and half and typically costs $395.[19] The client fills out a confidential client information form that asks, among other things, what "health complaints" the client seeks help with, whether he has seen "other doctors" for "this condition(s)," and for current and past prescription medications. During the EDT procedure, the client sits across a desk from the "tester" who attaches the GSR device to the client and stimulates acupuncture points on the client's fingers with a Piezo stimulator. The tester takes an initial reading with nothing in the circuit, and then adds many different homeopathic dilutions consisting of foods, environmental substances and toxins to the circuit to determine if the client has energy imbalances or blockages. The client holds "the negative probe (a brass rod) of the instrument while [the] tester touches the positive probe to the [client's] opposite hand. Correct reading is based upon proper location of the acupuncture point, probe angle, probe pressure, probe stroke and smoothness of the reading." The tester then adds various nutritional supplements to the circuit "to determine if they are prone to re-balance or restore energy flows." A consultant does the second half of the testing, "reviewing the client's health concerns, testing Other Disturbances, Energetically Weak Organs, Toxins, checking specific supplements to design a program, and explaining the program to the client." Positive EDT readings are recorded in writing on three different forms. There is a $99 follow-up appointment that lasts about an hour and involves all the same testing but does not include all the explanations.
¶ 12 Based on the EDT results for a given client, PHC employees fill out an "Electrodermal Test" form listing various specific deficiencies, such as vitamins, minerals, toxins and "other disturbances," including depression, stress and autoimmune problems. They fill out a "Food Avoidance List" checklist form listing the foods a client should avoid based on his EDT test. They also give the client a "Supplement Schedule" listing vitamins, minerals, herbs, digestive aids and homeopathic remedies the client should take based on his EDT results. PHC employees make the homeopathic dilutions themselves and sell clients supplements and homeopathic remedies.

A. Practice of Medicine

¶ 13 PHC argues the trial court erred by ruling that they practice medicine. Under RCW 18.71.011, a person practices medicine if, among other things, he or she
(1) Offers or undertakes to diagnose, cure, advise or prescribe for any human disease, ailment, injury, infirmity, deformity, pain or other condition, physical or mental, real or imaginary, by any means or instrumentality; [or]
(2) Administers or prescribes drugs or medicinal preparations to be used by any other person.
*624 No person may practice or represent himself or herself as practicing medicine without first having a valid license to do so.[20] The legislature passed Chapter 18.71 as an exercise of the police power to protect the health and well-being of the people of Washington.[21]
¶ 14 PHC asserts that they do not diagnose physical or mental conditions when they use EDT to determine the effects of particular substances on a person's energetic balances. They urge us to interpret the statute to exclude holistic, non-invasive health care, contending that a literal interpretation of the statute would cover virtually any service related to the human condition and would nullify related statutes' protections for oriental medicine, herbology, and nutritional counseling. The State argues that PHC's actual practices plainly fall within the statutory definition of practice of medicine. It contends there is no indication the legislature intended to cover only invasive diagnostic and treatment methods used for traditional western biomedical conditions when it regulated medical practice.
¶ 15 No cases interpret RCW 18.71.011(1), but an older Washington case provides useful analysis, and several other jurisdictions have grappled with issues similar to ours. In State v. Greiner, the State charged a chiropractor with practicing without the necessary certificate.[22] At that time, it was a misdemeanor for any person to practice "medicine and surgery, osteopathy, or any other system or mode of treating the sick or afflicted in the state of Washington" without a certificate.[23] Grenier had the complaining patient "remove her street clothing ... she diagnosed the patient's ailments with the aid of a vibrator; she manually manipulated the supposedly diseased parts; she prescribed a dietary for the patient; she collected a fee; and advised the patient to return for further manipulation."[24] Grenier argued that her methods were "adjustments" rather than "treatments" and that chiropractic science was not a subject for State regulation. The court held her explanation was a "mere play upon words," and that chiropractic science was
clearly a mode of treating the sick and afflicted. As such it is, by all authority, subject to regulation. To call the method of treatment "chiropractic" and the treatments given "adjustments" does not change its nature. If the practice has any beneficial purpose at all its purpose is to heal the sick and afflicted, and to regulate the practice of healing the sick and afflicted is unquestionably within the acknowledged powers of the state.[25]
¶ 16 In People v. Cantor, the California Court of Appeals considered whether a hypnotist practiced medicine.[26] The relevant statutory components were "practicing or attempting to do so, or advertising or a holding out as practicing, any system or mode of treating the sick or afflicted, or diagnosing, treating, or prescribing for any ailment, disease, disorder, or other mental or physical condition of any person."[27] Cantor advertised and told clients he would help with their headaches and weight problems. He tried to hypnotize them, put his hands on their heads in an attempt to relieve their conditions, and gave them instructions for self-hypnosis. He told them he was not a doctor. The court held that the evidence showed the defendant was "advertising, diagnosing and treating[.]"[28] It further stated:
It is our considered opinion that, in the light of the record in this case, the practice of hypnotism as a curative measure or mode of procedure by one not licensed to practice medicine, amounts to the unlawful practice of medicine. While it may be that one day the use of hypnotism may be recognized sufficiently to warrant the Legislature *625 to license that practice, to date it has not done so. To the extent that appellant employed or attempted to practice his hypnotic powers, he was practicing medicine within the meaning of [the statute].[29]
¶ 17 In People v. Amber, the New York Supreme Court had to decide whether acupuncture fell within the following statutory definition of the practice of medicine: "diagnosing, treating, operating, or prescribing for any human disease, pain, injury, deformity or physical condition."[30] Amber argued that acupuncture was a unique treatment method not contemplated by the law and that only "Western allopathic medicine" fell within the statute.[31] The court described acupuncture in detail based on a treatise provided by the defendant and acknowledged that it was a method and theory quite different from typical western medical treatment. But the court held that "a statute intended to regulate, limit or control the diagnosis and treatment of ailments must necessarily be broad enough to include the gamut of those known, whether or not recognized and even those not yet conjured."[32] It stated that it found
nothing in the pertinent provisions of the [statute] which exclude, directly or by implication, any manner of diagnosis or treatment which is not embraced within the definition of "Western allopathic medicine".... Whether actions constitute the practice of medicine is dependent upon the facts and not upon the name of the procedure, its origins or legislative lack of clairvoyance.[33]
Importantly, the court noted that despite the defendant's detailed description of acupuncture, he had
scrupulously avoided [ ] the fact that a patient is necessarily involved and that such patient seeks treatment, not out of curiosity but only because he is suffering pain or other physical ailment; that before he, the patient, can expect the anticipated relief from the harmonious workings of the dual forces of Yin and Yang, a diagnosis must be made, if not to recognize a "Western" disease, then at least to determine the existence of a disharmony brought about by the disequilibrium of Yin and Yang; that a proper diagnosis or determination necessarily involves an expert ability to palpate the 12 pulses in order to read the condition of the 12 organs and thus determine which of the 12 meridians must be used to convey the Yin and Yang to the seat of disharmony with the object of restoring the vital essence of "ch'i", which is described as an harmonious mixture of Yin and Yang....[34]
The court concluded, "[i]t may be, in fact, that acupuncture as a separately licensed healing modality is an idea whose time has come. It is not, however, for this court to declare its arrival. That task is for the Legislature."[35]
¶ 18 In People v. Rogers, defendant alternative health practitioner hooked clients up to a Phazx machine, a computer-based machine which used electrical impulses with attachments secured with Velcro.[36] The defendant assessed the conditions of various organs based on the machine's readings and recommended various dietary and exercise changes, along with remedies which she sold to the clients, based on the conditions the machine indicated. Michigan defined the "practice of medicine" as the
"diagnosis, treatment, prevention, cure or relieving of a human disease, ailment, defect, complaint, or other physical or mental condition, by attendance, advice, device, diagnostic test, or other means, or offering, undertaking, attempting to do, or holding *626 oneself out as able to do, any of these acts."[37]
Rogers argued only that Michigan's statutory definition of "practice of medicine" was overbroad and void for vagueness. There was no question her conduct constituted the practice of medicine under the statute. The Michigan Court of Appeals held that previous court decisions had narrowed the statute sufficiently to make it constitutional.[38]
¶ 19 As in these cases, under the plain language of the statute, PHC employees do practice medicine. They offer services to people with various afflictions and tell them they can help them feel better. Appellants maintain that they merely identify and treat energetic, or "Qi," imbalances rather than actual physical or mental conditions. But they represent that they can help people with arthritis, immune deficiencies, high cholesterol, and other physical conditions. They say in their brochure that they can help with "problems" such as candida, headaches, depression, PMS, infections, and osteoporosis. They use EDT to test for nutrient and mineral deficiencies, energetically weak organs, toxicities, and food and environmental sensitivities. EDT is the "means or instrumentality" they offer and use to find and advise on these conditions. Based on the EDT results, appellants fill out a checklist identifying a client's conditions, not the client's "Qi" levels. They then suggest, mix, and sell remedies intended to help relieve or cure those conditions. As appellants describe it, "Qi" is inextricably linked with physical and mental conditions. Further, the "Superbill" appellants provide clients includes a section titled "Diagnostic Categories" that lists various conditions and ailments including allergy, P.M.S., fibromyalgia, and multiple vitamin deficiencies. These conditions are assigned codes that correspond to classification numbers used by medical professionals when billing insurance companies.
¶ 20 PHC's terminology may differ from that of mainstream Western medicine, but ultimately they offer and use EDT to determine, or "diagnose," physical conditions or potential conditions, and then they suggest and provide remedies to address, or "treat," those conditions. They may diagnose conditions by analyzing energy levels, but they still diagnose conditions. As the Amber court stated, "[w]hether actions constitute the practice of medicine is dependent upon the facts and not upon the name of the procedure, its origins, or legislative lack of clairvoyance."[39] As in Amber, PHC's clients, or "patients," come to them for treatment because they suffer pain or discomfort or some other physical or mental manifestation, not because their "Qi" is out of balance. Before those clients can obtain the relief expected from a balanced "Qi," PHC employees must make a diagnosis, if not to recognize a "Western" condition, then at least to determine the existence of an imbalance brought about by various sensitivities or deficiencies.
¶ 21 Nothing supports PHC's view that the statute is intended to cover only diagnoses of serious conditions or invasive biomedical advice. Nor does anything demonstrate that the legislature intended to include only traditional Western medicine practices in its definition of "practice of medicine." We acknowledge appellants' concern that the statute's plain language could allow the State to regulate many practices the legislature could not have intended to regulate, such as elementary school teachers instructing students on health and hygiene or a Pilates instructor advising a client to hold in her stomach to prevent lower back pain. But those situations are not before us. Using EDT as an instrumentality to determine, or "diagnose," medical conditions in a patient and then recommending and selling specific remedies to that person to address those conditions, are practices that unquestionably fall within the valid police power the legislature exercised when it regulated the practice of medicine.
*627 ¶ 22 PHC argues that even if their actions fall under the plain language of the statute, related statutes and trends in public policy indicate the legislature could not have intended to require that they be licensed.[40] They contend the legislature intended that citizens have the freedom to choose alternative medicine practices. The State points out that Washington does so by licensing various "alternative" practices, including naturopathy, acupuncture, and massage. As the State argues, the legislature chose to license alternative health care to protect consumers from deceptive or harmful practices.
¶ 23 RCW 18.71.030 enumerates 14 exemptions to the statute, including some activities which constitute the practice of medicine, such as dentistry and naturopathy, but which may be performed under another license.[41] No one at PHC is licensed in any discipline, so this provision does not apply to them. RCW 18.36.050 lists four exemptions from the practice of naturopathic medicine, including the "practice of oriental medicine or oriental herbology, or the rendering of other dietary or nutritional advice."[42] But those exemptions only apply to the identified practices and do not exempt other practices, such as EDT, from licensure requirements. The same logic applies to the acupuncture statute, chapter 18.06 RCW, which excludes from acupuncture licensure requirements dietary advice based on oriental medical theory provided it is not given in conjunction with certain listed techniques.[43] But, again, PHC is not merely giving dietary advice. PHC also cites the Dietitians and Nutritionists statute, chapter 18.138 RCW, which excludes health food stores from licensing requirements.[44] But the same problem arises because PHC is not merely operating a health food store. Simply because some of their practices taken alone, would not require a license, does not mean they may engage in other activities which require one.
¶ 24 PHC contends that the "idea whose time has come is to allow alternative providers to provide health care for those who increasingly want it without being hampered by regulation." They point to other states that have enacted legislation allowing alternative providers to practice without a license provided their actions are not invasive. But our legislature has not yet embraced that policy. Even if EDT as a separately licensed, or even unregulated, health care modality is indeed an idea whose time has come, we must leave that decision to the legislature. PHC's actions constitute the practice of medicine under RCW 18.71.011.

B. Practice of Naturopathy

¶ 25 The legislature passed the naturopathy act, chapter 18.36A RCW, because it found it "necessary to regulate the practice of naturopaths in order to protect the public health, safety, and welfare."[45] The legislature defines the practice of naturopathy broadly to include
manual manipulation (mechanotherapy), the prescription, administration, dispensing, and use, except for the treatment of malignancies, of nutrition and food science, physical modalities, minor office procedures, homeopathy, naturopathic medicines, hygiene and immunization, nondrug contraceptive devices, common diagnostic procedures, and suggestion ....[46]
Nutrition and food science "means the prevention and treatment of disease or other human conditions through the use of foods, water, herbs, roots, bark, or other natural food elements."[47] A license is required to practice naturopathy.[48] As noted above, the statute exempts the practice of oriental medicine *628 or herbology, or rendering other dietary or nutritional advice.[49]
¶ 26 PHC argues their practice consists primarily of nutritional counseling and oriental medicine. But they prescribe and mix specific homeopathic remedies based on a specific client's EDT results. They intend that those remedies will prevent and treat the particular conditions EDT indicates are present. They also put together food avoidance lists based on the EDT results. Because they do more than simply recommend homeopathics or render nutritional advice, PHC employees practice naturopathy under RCW 18.36A.040.

C. Acupuncture

¶ 27 The legislature defines "acupuncture" as a "health care service based on an Oriental system of medical theory utilizing Oriental diagnosis and treatment to promote health and treat organic or functional disorders by treating specific acupuncture points or meridians."[50] Acupuncture includes, among other things, the "[u]se of electrical, mechanical, or magnetic devices to stimulate acupuncture points and meridians," and "[d]ietary advice based on Oriental medical theory provided in conjunction" with certain techniques including electrical stimulation of acupuncture points and meridians.[51] Acupuncturists must be licensed.[52]
¶ 28 PHC argues they do not practice acupuncture because they do not use EDT to treat anything. They acknowledge that they use a "Piezo stimulator" in the EDT process to mildly, non-invasively stimulate acupuncture points and meridians. But because this stimulation merely awakens the points and meridians for measurement purposes rather than treatment, it is not as professional acupuncture. However, the plain language of the statute requires only that the electrical devices "stimulate acupuncture points and meridians" to qualify as acupuncture. It does not require that the electrical device actually treat anything.[53] PHC employees practice acupuncture under RCW 18.06.010.

II. Consumer Protection Act

¶ 29 The CPA prohibits unfair or deceptive trade practices.[54] Where there is no dispute about what a party does in its trade or business, whether those actions constitute an unfair or deceptive trade practice under the CPA is an issue of law this court reviews de novo.[55] Conduct need not be intentional to be unfair or deceptive as long as it has "the capacity to deceive a substantial portion of the public."[56] The legislature has explicitly stated which statutory violations are per se CPA violations.[57] The unlawful practice of medicine is not a per se violation of the CPA.[58]
¶ 30 In Bowers v. Transamerica Title Insurance Co., the Washington Supreme Court *629 held that Transamerica's closing agents' preparation of certain closing documents constituted the practice of law, and that by preparing the documents the closing agents represented that they had the legal competence to do so.[59] The court held that
[p]otential clients might readily and quite reasonably believe that Transamerica's closing agents were qualified to provide the expertise that could be expected from a lawyer. Such a belief, though reasonable, is not well founded. In fact, the record is clear that the closing agents possessed no such expertise. Transamerica's conduct was therefore unfair and deceptive.[60]
The Bowers plaintiffs were damaged because Transamerica's unauthorized practice of law induced them to close real estate transactions without consulting legal counsel, who could have informed them of dangers inherent in the transactions.[61]
¶ 31 The State maintains that it does not allege a per se violation of the CPA. Rather, it argues that PHC violates the CPA by engaging in practices limited by law to licensed health care professionals. It also contends PHC has the capacity to deceive the public because, like the defendants in Bowers, they engage in practices for which they represent they have the expertise and training that only licensed professionals possess. PHC argues that even if their actions constitute the practice of medicine, that does not necessarily mean what they do has the capacity to deceive a substantial portion of the public. The trial court relied on Bowers in ruling that PHC violated the CPA.
¶ 32 Appellants represented themselves as being skilled in EDT and providing remedies based on EDT results. The State essentially argues that claim alone has the capacity to deceive consumers if the party's actions constitute the practice of medicine. In other words, when an unlicensed entity claims to and does perform some act covered by the practice of medicine statute, he or she is inherently less skilled than was represented to the public. This, the State asserts, is by definition a deceptive practice. But that does not account for people who, although unlicensed, have represented what they do correctly. The State effectively asks this court to adopt a per se rule that any unlicensed person who represents himself as skilled in a health practice modality violates the CPA if that modality constitutes the practice of medicine, regardless of whether his actual skill level matches his representations. That is not what Bowers held.
¶ 33 The defendants in Bowers represented that they were skilled in preparing closing documents, which constituted the practice of law, when in fact they were not. The crucial point for our CPA analysis is not simply that they were unqualified to practice law, but rather that the record demonstrated they were, in fact, not skilled in preparing the very closing documents they held themselves out as qualified to prepare. It was not their unlicensed practice of law itself that violated the CPA, as that would be a per se violation, but instead their lack of skill in preparing and advising clients about the meaning of those documents.
¶ 34 Here, PHC employees used EDT to diagnose and treat conditions. This constitutes the practice of medicine, but the State has not proved they were in fact not skilled in using EDT. To prove a deceptive practice, the State must demonstrate that PHC employees were not skilled in doing what they represented to the public they could do. Instead, the State relies solely on the fact that appellants were not licensed as proof that they misrepresented their skill level. Bowers is not broad enough to support the State's position. Bowers held that by preparing closing documents, the defendants had represented to the public that they were competent to prepare those documents when they were not. Their false representation of their level of competence was the deceptive practice for CPA purposes, not their unauthorized practice of law. Competence to perform a particular act and being licensed to perform that act are two different things. A party practicing law or medicine *630 without a license does not deceive the public if they do not claim to be licensed and are, in fact, competent or skilled in doing what they represent they can do. Someone who practices law or medicine without a license is not necessarily incompetent to perform the service that constitutes the practice of law or medicine. Under Bowers, the issue is whether that person in fact misrepresented his or her level of competence.
¶ 35 PHC represented to the public that they were skilled in EDT and could help people with various problems and maladies. They specifically said they were not medical doctors and did not claim to be licensed to practice any discipline. To prove a CPA violation, the State had to show that PHC employees were not skilled in using EDT or helping people in the manner they represented. This the State failed to do. In fact, the record is replete with evidence that PHC's clients believed its employees were competent at what they did.
¶ 36 Further, although the State need not present evidence that PHC's practices actually caused harm, it has failed to produce any evidence that there is even a reasonable possibility of harm. PHC has practiced for over 15 years in Washington. In that time, the State has not received any consumer complaints. Indeed, the only input from citizens has been outrage that the State was prosecuting PHC. The State must at least demonstrate that appellants' actions have a reasonable possibility of causing harm. Because it has not done so, its CPA claim cannot stand.
¶ 37 The trial court erred by ruling that appellants violated the CPA. Thus, it also abused its discretion by ordering penalties under the CPA.

ATTORNEY FEES
¶ 38 We award appellants reasonable attorney fees and costs because they are the prevailing party in the CPA action.[62]
¶ 39 We affirm the trial court's ruling that appellants engaged in the practices of medicine, naturopathy, and acupuncture. We reverse the trial court's ruling that appellants violated the CPA and its award of penalties under the CPA. We remand for further proceedings consistent with this opinion.
WE CONCUR: ELLINGTON and COLEMAN, JJ.
NOTES
[1] Kline explains this energy flow as follows: "In terms of Oriental medicine theory, there is an assumption that there is an ideal energy flow level on the different acupuncture meridians that correlates with optimum health. And when you have an imbalance which could be characterized as an overenergized or underenergized meridian, that creates a disturbance which ... ultimately could create a specific health problem."
[2] Kline's Ph.D. is a correspondence degree based on a volume of work he submitted over a number of years.
[3] (Emphasis omitted.)
[4] (Emphasis omitted.)
[5] Bowers v. Transamerica Title Ins. Co., 100 Wash.2d 581, 675 P.2d 193 (1983). "Let me just state also for the record, just so that it's addressed specifically, and anybody reviewing this understands that under Bowers I do believe that this court's determination that there has been a lawyer's practice is a violation of the Consumer Protection Act."
[6] At the end of the hearing, after the parties discussed the proposed order, the court confirmed that she was not ruling on the validity of EDT as a practice method:

I never reached the merits of this machine in terms of whether it was effective or not, whether it was science-based or not. That was not the issue. The issue was simply were his practices as he prescribed the materials the unlicensed  or the practice, frankly, within the three statutes  are [they] actions that should be licensed under those three statutes? That is the sole basis for the decision....
[7] The court found appellants had committed 9,426 separate violations within the statute of limitations' allowable period on the State's claim. It awarded slightly more than $100 per violation. On September 30, 2005, the court amended the order specifying the terms of the consumer restitution payment, and on October 11 the court entered an order clarifying that it had granted DOH's request for injunctive relief as part of the original summary judgment ruling.
[8] The State has moved to strike portions of appellant's reply brief, asserting that the "legislative facts" appellants cite are not facts at all and this court should not take judicial notice of them. They have no bearing on our decision, so we deny the State's motion to strike. The State has also moved for sanctions under RAP 10.2(i) and RAP 18.9 because PHC mailed its reply brief late. RAP 18.9 provides that we may order a party to pay sanctions for failing to comply with appellate rules. The postal date stamp on the reply brief is April 27, 2006, two days after the April 25, 2006 extended deadline. Appellants argue they put the envelope in the mail on April 26, which was still one day late. But the State does not contend that it was harmed by the short delay, and we decline to impose sanctions for such a minor transgression.
[9] Jones v. Allstate Ins. Co., 146 Wash.2d 291, 300, 45 P.3d 1068 (2002).
[10] CR 56(c).
[11] Mountain Park Homeowners Ass'n v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994).
[12] Hartley v. State, 103 Wash.2d 768, 775, 698 P.2d 77 (1985) (citing La Plante v. State, 85 Wash.2d 154, 531 P.2d 299 (1975); Balise v. Underwood, 62 Wash.2d 195, 381 P.2d 966 (1963)).
[13] State v. Jackson, 91 Wash.App. 488, 491, 957 P.2d 1270 (1998) (citing State v. Tatum, 74 Wash. App. 81, 86, 871 P.2d 1123 (1994)), review denied, 137 Wash.2d 1038, 980 P.2d 1285 (1999).
[14] Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 154 Wash.2d 224, 238, 110 P.3d 1132 (2005) (citing King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 555, 14 P.3d 133 (2000)).
[15] Id. at 239, 110 P.3d 1132 (citing King County, 142 Wash.2d at 555, 560, 14 P.3d 133).
[16] State ex rel. Citizens Against Tolls v. Murphy, 151 Wash.2d 226, 242-43, 88 P.3d 375 (2004).
[17] RCW 18.71.021 (medical doctor); RCW 18.36A.030 (naturopathy doctor); RCW 18.06.020 (acupuncture).
[18] RCW 18.130.190(6).
[19] Our description of PHC's practice, including EDT, is based largely on their responses to the State's interrogatories.
[20] RCW 18.71.021.
[21] RCW 18.71.003(1)(2).
[22] 63 Wash. 46, 114 P. 897 (1911).
[23] Id. at 49, 114 P. 897.
[24] Id. at 51, 114 P. 897.
[25] Id. at 51-52, 114 P. 897.
[26] 198 Cal.App.2d Supp. 843, 18 Cal.Rptr. 363 (1961).
[27] Id. at 845, 18 Cal.Rptr. 363.
[28] Id. at 849, 18 Cal.Rptr. 363.
[29] Id. at 850, 18 Cal.Rptr. 363.
[30] 76 Misc.2d 267, 268, 349 N.Y.S.2d 604 (1973) (quoting N.Y. Education Law § 6521). The statute had retained its broad language since it was enacted in 1907. Id. at 269, 349 N.Y.S.2d 604.
[31] Id. at 273, 349 N.Y.S.2d 604.
[32] Id.
[33] Id.
[34] Id. at 274, 349 N.Y.S.2d 604.
[35] Id. at 275, 349 N.Y.S.2d 604. Accord, People v. Roos, 118 Ill.2d 203, 113 Ill.Dec. 81, 514 N.E.2d 993 (1987).
[36] 249 Mich.App. 77, 641 N.W.2d 595 (2001).
[37] Id. at 92, 641 N.W.2d 595 (quoting MCL 333.17001(1)(d)).
[38] Id. at 101, 641 N.W.2d 595. PHC mentions that there are obvious constitutional issues in this case, but cite the Rules of Appellate Procedure limitations as the reason why they provide no supporting argument.
[39] 76 Misc.2d at 273, 349 N.Y.S.2d 604.
[40] Appellants cite various papers and declarations extolling the virtues and validity of EDT. But the validity of EDT is not at issue in this case.
[41] RCW 18.71.030(4).
[42] RCW 18.36A.050(4).
[43] RCW 18.06.010(1)(k).
[44] RCW 18.138.110.
[45] RCW 18.36A.010.
[46] RCW 18.36A.040.
[47] RCW 18.36A.020(6).
[48] RCW 18.36A.030(1).
[49] RCW 18.36A.050(4).
[50] RCW 18.06.010(1).
[51] RCW 18.06.010(1)(b), (k).
[52] RCW 18.06.020(1).
[53] RCW 18.06.010(1)(b).
[54] RCW 19.86.020.
[55] Robinson v. Avis Rent A Car Sys., 106 Wash. App. 104, 114, 22 P.3d 818 (citing Leingang v. Pierce County Med. Bureau, 131 Wash.2d 133, 150, 930 P.2d 288 (1997); Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc., 64 Wash.App. 553, 560, 825 P.2d 714, review denied, 120 Wash.2d 1002, 838 P.2d 1143 (1992); Grayson v. Nordic Constr. Co., 22 Wash.App. 143, 148-49, 589 P.2d 283 (1978), reversed on other grounds, 92 Wash.2d 548, 599 P.2d 1271 (1979)), review denied, 145 Wash.2d 1004, 35 P.3d 381 (2001).
[56] Bowers, 100 Wash.2d at 592, 675 P.2d 193 (citing Haner v. Quincy Farm Chems., Inc., 97 Wash.2d 753, 759, 649 P.2d 828 (1982)).
[57] See, e.g., RCW 19.190.030(3) (a violation of the Commercial Electronic Mail Act constitutes "an unfair or deceptive act in trade or commerce... for the purpose of applying the consumer protection act."); RCW 19.146.100 (a violation of the Mortgage Brokers Practices Act is a CPA violation); RCW 19.178.110 (a violation of the Going Out of Business Sales Act is a CPA violation); RCW 19.16.440 (collection agencies operating without a license or committing acts prohibited by the governing statute violate the CPA).
[58] See State v. Schwab, 103 Wash.2d 542, 548-49, 693 P.2d 108 (1985) (violations of statutes promulgated in the public interest do not constitute per se CPA violations) (citing Haner, 97 Wash.2d at 761-63, 649 P.2d 828).
[59] 100 Wash.2d 581, 675 P.2d 193 (1983).
[60] Id. at 592, 675 P.2d 193.
[61] Id.
[62] The prevailing party in a CPA action may, in the discretion of the court, be awarded attorney fees and costs. RCW 19.86.080.