*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

EBONY JEWEL MAHONE,

        Defendant-Appellant.

UNPUBLISHED
August 29, 2024

Nos. 360642; 360669
Berrien Circuit Court
LC Nos. 2021-000576-FH;
        2020-003332-FH

Before: GADOLA, C.J., and K. F. KELLY and MARIANI, JJ.

PER CURIAM.

In Docket No. 360642, defendant appeals by right her jury-trial convictions of possession with intent to deliver less than 50 grams of cocaine (PWID), MCL 333.7401(2)(a)(*iv*), and keeping or maintaining a drug house, MCL 333.7405(1)(d); MCL 333.7406. The trial court sentenced defendant as a second-offense drug offender, MCL 333.7413(1), to concurrent terms of 36 to 480 months' imprisonment and 39 days in jail, respectively. In Docket No. 360669, defendant appeals by right her jury-trial convictions of felon in possession of a firearm (felon-in-possession), MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a second-offense habitual offender, MCL 769.10, to terms of 24 to 90 months' imprisonment and two years' imprisonment, respectively.[1] For the reasons set forth in this opinion, we affirm, but remand for the ministerial task of correcting clerical errors in both judgments of sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 6:00 a.m. on September 25, 2020, members of the Berrien County Sheriff's Department, several of whom were also members of the Southwest Enforcement Team

---

[1] We consolidated these cases "to advance the efficient administration of the appellate process." *People v Mahone*, unpublished order of the Court of Appeals, entered May 4, 2022 (Docket Nos. 360642; 360669).

(SWET), executed a search warrant authorizing a search for evidence of controlled substances and drug trafficking at a house on Pearl Street belonging to defendant's boyfriend, John Parson. Defendant and Parson were found in the bedroom together, and they were interviewed separately by officers. After Lieutenant Shawn Yech, who was supervising the search, issued *Miranda*[2] warnings to her, defendant reported that she lived at the house with Parson. Defendant also told him that there was a gun on the bed and that, after a relative of Parson left the gun at the house, she kept it there for protection. Lieutenant Yech subsequently located the gun where defendant had described and seized it. In the dining room, an officer found a blue zipper bag containing a ball of tinfoil, inside of which were 31 crack cocaine rocks individually packaged in smaller pieces of tinfoil. On a table near the blue bag, the officer also saw in plain view several small squares of tinfoil and a plate with a razorblade on it, both of which had cocaine residue on them. The officers did not find any drug paraphernalia indicating personal drug use during their search of the house.

Officers executed another search warrant at the Pearl Street house at approximately 6:00 a.m. on February 12, 2021.[3] As the officers prepared to enter, one of the officers saw someone peering out of the bedroom window, which was near the entryway and faced the front of the house. Upon entering the house, the officer saw Parson sitting on the living room couch and defendant standing in the area between the dining room and the kitchen, which opened into a bathroom.[4] Defendant was again provided *Miranda* warnings and interviewed by an officer, and defendant stated that she had been getting ready to smoke crack cocaine in the kitchen when the officers entered the house. Defendant further stated that she ordinarily smoked crack with a pipe fashioned out of tinfoil and had done so immediately prior to the search, but she balled up the pipe and threw it down the kitchen sink drain. The interviewing officer later investigated the kitchen sink and could not locate any tinfoil as described by defendant in or near the sink or sink drain. Other searching officers discovered in the living room a blue zipper bag containing a black scale with residue of crack cocaine on it. Officers also discovered 23 small tinfoil bundles containing crack cocaine in the toilet and strewn about the bathroom floor a few feet from where defendant was standing. In the main bedroom, officers found a razorblade with residue of crack cocaine on it, a small piece of metal that appeared brown on one end, and a purse containing, among other things, tinfoil, women's hair accessories, and several identifying documents belonging to defendant, including a credit card, a driver's license, and various bank documents. At least one of the documents that bore defendant's name listed her residential address as a house on Colfax Avenue. Officers also discovered various articles of defendant's clothing hanging in the closet in the second bedroom and her socks at the bottom of a hamper for dirty laundry.

---

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[3] The record does not contain a copy of the February 2021 search warrant, nor is one provided on appeal, but preliminary-examination testimony from an officer involved in the February 2021 search indicated that the warrant authorized a search of the Pearl Street house for evidence of controlled substances. It is unclear from the record whether this, similar to the September 2020 search warrant, included evidence of controlled-substance trafficking.

[4] Defendant's 14-year-old daughter was also in the house at the time of the search, and officers found her asleep in the second bedroom at the back of the house.

At trial, Lieutenant Yech, who supervised both searches, and a SWET detective who participated in the February 2021 search both testified that defendant contacted the department after they left their contact information at the Pearl Street house following the second search. Lieutenant Yech testified that defendant later met with him and the detective to discuss the possibility of "working off" the charges that they were submitting against her. During the meeting, defendant told them that she lived in the Pearl Street house with Parson, regularly used crack cocaine, and helped Parson sell drugs by delivering them in exchange for drugs for her personal use.

Several officers involved in the searches also testified about the significance of the various pieces of evidence seized from the Pearl Street house. After viewing several photographs of the seized tinfoil bundles containing crack cocaine, the officer who located the crack cocaine during both searches testified that it appeared that all of the drugs were packaged with the same material and in the same manner. An officer involved in the second search described Parson as a heavyset man requiring an oxygen tank and officer assistance putting pants, socks, and shoes on because he was "having a very difficult time" doing so on his own. Defendant, meanwhile, "was able to move around quite well" without assistance. Another officer involved in the second search testified that he found a piece of defendant's mail that displayed the Colfax Avenue address and that, in his experience investigating drug trafficking, it was common to find mail displaying a different address than that of the house being searched for evidence of drug trafficking.

In addition to testifying about his role in the two searches of the Pearl Street house, Lieutenant Yech, who had significant experience handling cases involving crack cocaine, also testified as an expert in the sale and distribution of narcotics for the prosecution. Lieutenant Yech testified about how crack cocaine was commonly packaged, what items were typically used to package crack cocaine for distribution, and how crack cocaine was commonly distributed. He also explained the quantity of crack cocaine ordinarily purchased and consumed by an average user. Lieutenant Yech testified that the 31 individually packaged bundles of crack cocaine seized during the first search were, in his opinion, "consistent with sales and distribution of crack cocaine" rather than mere possession for personal use, based on the drugs' quantity and packaging as well as other items found during the search. Lieutenant Yech similarly opined that "the 23 individually packaged crack rocks" seized during the second search were "for sales and distributions" based on their packaging, the location and circumstances in which they were found, and other items found during the search. Lieutenant Yech also echoed the earlier testimony of another officer regarding the piece of defendant's mail displaying a Colfax Avenue address, stating, "It's common for us to find mail with a different address on it and [you] typically don't have your mail sent to your drug house."

Defendant testified on her own behalf. Defendant testified that, although she was dating Parson at the time of both searches, she never lived with Parson or helped him sell drugs, and she denied ever telling Lieutenant Yech and the detective otherwise. Defendant maintained that she lived at her mother's house on Colfax Avenue and that she and her children only occasionally slept at Parson's house on Pearl Street due to her dating relationship with Parson. Defendant admitted that she used crack cocaine, had been first introduced to Parson 14 years prior to buy crack cocaine from him, and knew that Parson sold crack cocaine "at points when [she was] living with him." Defendant also admitted that Parson gave or sold her crack cocaine for personal use and that she regularly smoked crack cocaine "all over" the Pearl Street house. Defendant also admitted that,

-3-

while Parson "did his best to hide" the drugs from her, she occasionally stole drugs from Parson for personal use when he did not give or sell them to her. Defendant testified that she knew that Parson typically hid crack cocaine in a blue zipper bag that contained his medicine and that she frequently accessed the bag to assist Parson with his medication, but she did not personally store anything in the bag and had not seen any illegal drugs in the bag when she looked inside of it a few days prior to the first search. Defendant also testified that she was unaware how all of the small tinfoil bundles containing crack cocaine ended up scattered in and around the toilet in the bathroom.

The jury convicted defendant as described. After sentencing, defendant moved for a new trial or an evidentiary hearing and moved to correct an invalid sentence. After holding a hearing on the motions, the trial court denied them. This appeal followed.

## II. MCL 333.7405(1)(D)

Defendant seeks relief from her conviction of keeping or maintaining a drug house under MCL 333.7405(1)(d) on two bases: the statute is unconstitutionally vague and overbroad, and there was insufficient evidence to support the conviction. We disagree with both arguments.

## A. KEEPING OR MAINTAINING A DRUG HOUSE

MCL 333.7405(1)(d) provides, in relevant part, that a person shall not

> [k]nowingly keep or maintain a . . . dwelling . . . that is frequented by persons using controlled substances in violation of this article for the purpose of using controlled substances or that is used for keeping or selling controlled substances in violation of this article.[5]

"The phrase 'keep or maintain' implies usage with some degree of continuity that can be deduced by actual observation of repeated acts or circumstantial evidence." *People v Thompson*, 477 Mich 146, 155; 730 NW2d 708 (2007). "[A] person may be deemed to keep and maintain a drug house if that person has the ability to exercise control or management over the house." *People v Bartlett*, 231 Mich App 139, 152; 585 NW2d 341 (1998). An individual need not own, rent, or reside in a drug house "to 'keep or maintain' " it; rather, he or she need only "exercise authority or control over the property for purposes of making it available for keeping or selling proscribed drugs[.]" *People v Griffin*, 235 Mich App 27, 32; 597 NW2d 176 (1999), overruled in part by *Thompson*, 477 Mich at 148, 157 (explaining that the phrase "keep or maintain" requires an individual to exercise some degree of authority or control over the property but rejecting that he or she must " 'do so continuously for an appreciable period' "). See also *Thompson*, 477 Mich at 156 (quoting with approval *Dawson v State*, 894 P2d 672, 678-679 (Alas App, 1995), for the proposition that " '[t]he state need not prove that the property was used for the exclusive purpose of keeping or distributing controlled substances, but such use must be a substantial purpose of the users of the

---

[5] The phrase "this article" refers to the Controlled Substances Act, Article 7 of the Public Health Code, MCL 333.7101 *et seq*.

property, and the use must be continuous to some degree; incidental use of the property for keeping or distributing drugs or a single, isolated occurrence of drug-related activity will not suffice' ").

## B.  SUFFICIENCY OF THE EVIDENCE

Defendant argues that the prosecution presented insufficient evidence to prove beyond a reasonable doubt that she was guilty of keeping or maintaining a drug house as a principal or an aider and abettor.[6]  We review de novo challenges to sufficiency of the evidence, viewing the evidence "in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Roper*, 286 Mich App 77, 83; 777 NW2d 483 (2009).  "The prosecution need not negate every theory consistent with innocence, but is obligated to prove its own theory beyond a reasonable doubt, in the face of whatever contradictory evidence the defendant may provide." *People v Chapo*, 283 Mich App 360, 363-364; 770 NW2d 68 (2009).  It is the trier of fact's role to determine "the weight of the evidence [and] the credibility of witnesses," and we will not interfere with that role.  *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).  "Circumstantial evidence and reasonable inferences arising therefrom can constitute satisfactory proof of the elements of a crime."  *People v Reddick*, 187 Mich App 547, 551; 468 NW2d 278 (1991).

As previously summarized, this Court and our Supreme Court have made clear that, for the jury to find defendant guilty of keeping or maintaining a drug house as a principal, the prosecution was required to prove that defendant knowingly kept or maintained the Pearl Street house—i.e., exercised authority or control over the house with some degree of continuity—for purposes of making it available for keeping or selling proscribed drugs.  *Thompson*, 477 Mich at 155-156; *Griffin*, 235 Mich App at 32.  For the jury to find defendant guilty of keeping or maintaining a drug house under an aiding-and-abetting theory, the prosecution was required to prove:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement. [*People v Plunkett*, 485 Mich 50, 61; 780 NW2d 280 (2010) (quotation marks, citations, and alteration omitted).]

"An aider and abettor's state of mind may be inferred from all the facts and circumstances," and factors to be considered in determining whether a defendant aided and abetted the commission of a crime "include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *People v Carines*, 460 Mich 750, 757-758; 597 NW2d 130 (1999) (quotation marks and citation

---

[6] The prosecution in this case advanced both a principal and an aiding-and-abetting theory for keeping or maintaining a drug house, and the jury was instructed on the necessary elements of both, but no specific finding was requested of or made by the jury when it rendered its verdict. Accordingly, we address both theories.

omitted). A defendant's mere presence, "even with knowledge that an offense is about to be committed or is being committed," is insufficient to establish that he or she was an aider and abettor. *People v Norris*, 236 Mich App 411, 419-420; 600 NW2d 658 (1999).

Defendant does not dispute that Parson owned and resided in the Pearl Street house, that drugs were found in the house during both searches, that Parson regularly kept drugs in the house, that Parson sold drugs, and that she frequently used drugs given or sold to her by Parson while in the house. Rather, defendant only argues on appeal that the prosecution failed to present sufficient evidence to establish that she, under a principal theory, exercised authority or control over the house or, under an aiding-and-abetting theory, assisted Parson in exercising authority or control over the house. We disagree.

As to the principal theory, multiple officers testified that defendant told them in interviews during the searches that she lived with Parson at the Pearl Street house, and Lieutenant Yech testified that defendant stated the same at a subsequent interview. This was further supported by testimony from multiple investigating officers that defendant was present during both searches and that they found several of defendant's personal belongings throughout the house. There was also testimony that Parson required physical assistance to do even small, day-to-day tasks, such as putting on pants, and defendant, meanwhile, could move around easily unassisted. Defendant admitted that she was dating Parson at the time of both searches and her testimony indicated that she was well aware of and had regular access to the drugs and drug paraphernalia in the house. Lieutenant Yech testified that defendant admitted during an interview that she delivered drugs for Parson, and an officer involved in the second search testified that he saw defendant within a few feet of the individually-packaged drugs scattered in and around the toilet in the bathroom. Defendant maintains that she did not own, rent, or legally reside at the Pearl Street house, but she did not need to do so in order to "keep or maintain" it under MCL 333.7405(1)(d). See *Thompson*, 477 Mich at 155-156; *Griffin*, 235 Mich App at 32. Given the evidence presented, a reasonable jury could have found that defendant exercised authority or control over the house with some degree of continuity for purposes of making it available for keeping or selling proscribed drugs. See *Roper*, 286 Mich App at 83. Therefore, there was sufficient evidence to support defendant's conviction of keeping or maintaining a drug house under a principal theory.

This conclusion, in our view, is only clearer under an aiding-and-abetting theory. Again, there was evidence that defendant delivered drugs for Parson; that she knew that Parson sold drugs and had drugs in the house; and that she regularly stayed with Parson and that Parson needed significant assistance with even small tasks. Officer testimony also established that defendant was present during both searches and was seen standing within a few feet of the individually-packaged drugs discovered in the bathroom during the second search. Given this, a jury could have reasonably inferred from the facts and circumstances presented that Parson kept or maintained a drug house, defendant performed acts or gave encouragement that assisted him in doing so, and defendant provided that assistance knowing that Parson intended to keep or maintain a drug house or intending the same herself. See *Plunkett*, 485 Mich at 61; *Carines*, 460 Mich at 757-758. Accordingly, there was sufficient evidence to support defendant's conviction of keeping or maintaining a drug house under an aiding-and-abetting theory.

C. CONSTITUTIONAL CHALLENGES

Defendant has also failed to show that MCL 333.7405(1)(d) is unconstitutionally vague and overbroad. "We review de novo whether a statute . . . is unconstitutional under the doctrines of vagueness or overbreadth." *Van Buren Twp v Garter Belt, Inc*, 258 Mich App 594, 627; 673 NW2d 111 (2003). A statute is presumed to be constitutional, and we must construe it as such unless its unconstitutionality is clearly apparent. *People v Malone*, 287 Mich App 648, 658; 792 NW2d 7 (2010). "The party challenging a statute's constitutionality cannot merely claim unconstitutionality, but has the burden of proving its invalidity." *Id*. (quotation marks and citation omitted).

The constitutional doctrines of vagueness and overbreadth are distinct, but they are related in that they "both curb arbitrary and discriminatory enforcement." *Van Buren Twp*, 258 Mich App at 628. "The doctrines are often considered together because they are closely related, especially where claims of First Amendment violations are raised." *Id*. A criminal statute may be void for vagueness if it: "(1) fails to provide fair notice to the public of the proscribed conduct, (2) gives the trier of fact unstructured and unlimited discretion to determine if an offense has been committed, or (3) is overbroad and impinges on First Amendment rights." *People v Gaines*, 306 Mich App 289, 319; 856 NW2d 222 (2014).

When evaluating a vagueness challenge, this Court "must examine the entire text of the statute and give the words of the statute their ordinary meanings." *Id*. 306 Mich App at 319. A statute provides fair notice of the conduct proscribed when it gives "a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Malone*, 287 Mich App at 658 (quotation marks and citation omitted). Stated differently, "[a] statute is unconstitutionally vague if persons of ordinary intelligence must necessarily guess at its meaning." *Gaines*, 306 Mich App at 319 (quotation marks and citation omitted). "A statute is sufficiently definite if its meaning can fairly be ascertained by reference to judicial interpretations, the common law, dictionaries, treatises, or the commonly accepted meanings of words." *Id*. (quotation marks and citation omitted). "When determining whether a statute is void for vagueness, the reviewing court need not set aside common sense, nor is the Legislature required to define every concept in minute detail. Rather, the statutory language need only be reasonably precise." *Dep't of State Compliance & Rules Div v Mich Educ Ass'n-NEA*, 251 Mich App 110, 120; 650 NW2d 120 (2002). See also *Van Buren Twp*, 258 Mich App at 632 ("Laws written in words cannot achieve the precision of a mathematical formula."). If it is clear what the statute "as a whole prohibits," then the statute is not unconstitutionally vague. *Id*.at 631 (quotation marks and citations omitted).

In general, "[a] defendant may not challenge a statute as unconstitutionally vague when the defendant's own conduct is fairly within the constitutional scope of the statute," and "[t]he fact that a hypothetical may be posed that would cast doubt upon the statute does not render it unconstitutionally vague." *Malone*, 287 Mich App at 658-659. "Rather, the analysis must center on whether the statute, as applied to the actions of the individual defendant, is constitutional." *Id*. at 659. When a vagueness challenge is premised on the impingement of First Amendment rights, however, the rights of others not before the court are considered to determine whether the statute is unconstitutionally overbroad. *People v Rogers*, 249 Mich App 77, 95-96; 641 NW2d 595 (2001). For a statute to be unconstitutional on this basis, its "overbreadth . . . must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id*. at 96 (quotation marks and citation omitted). "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth

challenge." *Van Buren Twp*, 258 Mich App at 629 (quotation marks and citations omitted). "Rather, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Rogers*, 249 Mich App at 96 (quotation marks and citation omitted).

Defendant's constitutional challenges to MCL 333.7405(1)(d) fail under the law that governs them. To start, defendant has not shown that the statute is unconstitutionally vague. As discussed, the statute and its accompanying judicial interpretations have made clear what the statute "as a whole prohibits," *Van Buren Twp*, 258 Mich App at 631 (quotation marks and citations omitted): namely, as relevant here, that an individual cannot knowingly keep or maintain a house— i.e., exercise authority or control over the house with some degree of continuity—for purposes of making it available for keeping or selling proscribed drugs, *Thompson*, 477 Mich at 155-156; *Griffin*, 235 Mich App at 32. Nor, as with any criminal prohibition, can an individual perform acts or give encouragement that assist someone else in doing so, with intent that the crime be committed or with knowledge of the other's intent. *Plunkett*, 485 Mich at 61. The contours of this prohibition are "reasonably precise" in light of its subject matter, *Dep't of State Compliance*, 251 Mich App at 120, and the prohibition's incorporation of scienter requirements works to only further alleviate any vagueness concerns, *People v Lawhorn*, 320 Mich App 194, 203; 907 NW2d 832 (2017).

Defendant contends that the statute is unclear about what exactly is enough to constitute "keeping" or "maintaining" a drug house, particularly in the aiding-and-abetting context, and offers assorted hypotheticals involving a girlfriend who occasionally visits her boyfriend's house, knowing that drugs are used or sold there, and performs different types and levels of household-related tasks. Beyond listing these hypotheticals, however, defendant does little to scrutinize them under the legal criteria governing liability under MCL 333.7405(1)(d).[7] Furthermore, and more fundamentally, a statute need not "achieve the precision of a mathematical formula" to pass constitutional muster, *Van Buren Twp*, 258 Mich App at 632, and the mere ability to conjure hypotheticals that might "cast doubt upon the statute does not render it unconstitutionally vague," *Malone*, 287 Mich App at 659. Nor do these hypotheticals align with "the actions of the individual defendant" in this case. *Id.* To the contrary, as previously detailed, the proofs at trial demonstrated that defendant engaged in conduct well within the scope of MCL 333.7405(1)(d)'s prohibition. Defendant has failed to show that the statute does not provide "fair notice" of its proscription of her conduct, or that it "gives the trier of fact unstructured and unlimited discretion to determine if an offense has been committed." *Gaines*, 306 Mich App at 319.

Defendant has also failed to show that the statute is impermissibly overbroad. As defendant notes, the United States Supreme Court has recognized a constitutionally protected "freedom of association" with respect to certain intimate and familial relationships "because of the role of such

---

[7] For instance, defendant offers nothing to substantiate the notion that criminal liability under MCL 333.7405(1)(d) would conceivably attach to a girlfriend who simply visits her boyfriend's house, knowing drugs are being used there, but does nothing more. See, e.g., *Norris*, 236 Mich App at 419-420 (explaining that mere presence, "even with knowledge that an offense is about to be committed or is being committed," is insufficient to establish aiding-and-abetting liability).

relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Roberts v United States Jaycees*, 468 US 609, 618-619; 104 S Ct 3244; 82 L Ed 2d 462 (1984). But defendant has not shown that MCL 333.7405(1)(d) sweeps within its prohibition a "real" and "substantial" amount of such constitutionally protected conduct. *Rogers*, 249 Mich App at 96 (quotation marks and citation omitted). To the contrary, defendant has only cursorily offered a few hypotheticals without meaningful examination of whether they would even plausibly fall within both the statute's scope and the First Amendment's protections—let alone whether the extent of such potential overlap would be "substantial" relative "to the statute's plainly legitimate sweep." *Id*. (quotation marks and citation omitted). Even if "one can conceive of some impermissible applications" of MCL 333.7405(1)(d), that "mere fact" alone "is not sufficient to render it susceptible to an overbreadth challenge." *Van Buren Twp*, 258 Mich App at 629. To sustain this facial challenge, defendant must show "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Rogers*, 249 Mich App at 96 (quotation marks and citation omitted). Defendant has fallen well short of that standard here.

In sum, defendant bears the burden of overcoming the presumed constitutionality of MCL 333.7405(1)(d). *Malone*, 287 Mich App at 658. She has failed to carry that burden, and we therefore decline to declare the statute unconstitutionally vague or overbroad, facially or as applied to her in this case.

## III.  MCL 333.7413(1)

Defendant argues that the trial court's decision to double her minimum and maximum sentence for her PWID conviction pursuant to MCL 333.7413(1) constituted cruel or unusual punishment expressly prohibited by the Michigan Constitution, Const 1963, art 1, § 16. According to defendant, it was unconstitutionally cruel or unusual for the trial court to decide to double her sentence based her past convictions for possession of marijuana, given that possession of marijuana is now decriminalized in Michigan.[8] Defendant concedes, however, that the sentence itself imposed by the trial court for her PWID conviction was not cruel or unusual, and she provides no legal authority for the notion that a sentence that is not cruel or unusual may nevertheless constitute cruel or unusual punishment under the Michigan Constitution.[9]

---

[8] While possession and use of marijuana have been decriminalized to some extent under Michigan law, see, e.g., MCL 333.27955, defendant does not particularly substantiate her assertion that the specific conduct for which she was previously convicted is now decriminalized. For the reasons discussed above, however, her claim fails regardless.

[9] Defendant frames her argument around the four-pronged test that has been developed to analyze claims of cruel or unusual punishment. See, e.g., *People v Parks*, 510 Mich 225, 242; 987 NW2d 161 (2022) (noting that, when "evaluating the proportionality of sentences under the 'cruel or unusual punishment' clause," Michigan courts must consider: "(1) the severity of the sentence relative to the gravity of the offense; (2) sentences imposed in the same jurisdiction for other offenses; (3) sentences imposed in other jurisdictions for the same offense; and (4) the goal of rehabilitation"). Defendant, however, fails to explain, and we fail to see, how she might be entitled

Moreover, defendant's claim is belied by the record in this case. While defendant's prior convictions are what brought MCL 333.7413(1) into play, that statute did not require the trial court to double defendant's sentence, and defendant's prior marijuana-related convictions are not what drove the court's decision to exercise its discretion under the statute. Rather, the court based its discretionary decision to double defendant's sentence under MCL 333.7413(1) on the factual underpinnings of her convictions in the instant case, including "the weapon . . . , the quantity of drugs involved in this situation, [and] the attempt to conceal the evidence and drugs[.]" Defendant does not challenge the underlying reasons of the trial court's decision to enhance her sentence pursuant to MCL 333.7413(1), and, as discussed, she admits that the sentence she received in the end was neither cruel nor unusual.

In sum, defendant has failed to identify a colorable basis for relief on this claim.

## IV. DOUBLE JEOPARDY

Defendant argues that her convictions of felon-in-possession and felony-firearm violated her constitutional protection against double jeopardy. Our Supreme Court recently considered an application for leave to appeal regarding whether *People v Calloway*, 469 Mich 448, 449-450; 671 NW2d 733 (2003), which held that convicting a defendant of felony-firearm and felon-in-possession does not implicate double jeopardy, was correctly decided. *People v Monroe*, 509 Mich 1072, 1072; 975 NW2d 782 (2022). Defendant conceded in her brief that the Supreme Court's decision in *Monroe* would ultimately control this Court's decision on this issue and had asked this Court to hold its decision on this issue in abeyance until the Supreme Court reached a decision in *Monroe*, which this Court granted.[10] Our Supreme Court has since declined to review the pending challenge. *People v Monroe*, 511 Mich 1117, 1117; 992 NW2d 663 (2023). See also *id*. at 1117-1118 (WELCH, J., concurring) (explaining that denying leave was appropriate because "the Legislature clearly intended for multiple punishments to be imposed when a person with a felony possesses a firearm" but writing separately "to urge the Legislature to reconsider" that status quo). Accordingly, defendant's claim remains foreclosed by binding precedent. See *People v Armisted*, 295 Mich App 32, 53; 811 NW2d 47 (2011) ("[T]his Court is without authority to reverse decisions of the Michigan Supreme Court.").

## V. DRUG-PROFILE EVIDENCE

Defendant argues that, at trial, Lieutenant Yech offered improper drug-profile testimony that commented on her guilt. According to defendant, the trial court plainly erred by admitting this testimony and defense counsel was ineffective for failing to object or request a limiting instruction. We see no grounds for relief.

---

to relief under this test when she has conceded that the sentence she received for the offense she committed is not cruel or unusual.

[10] *People v Mahone*, unpublished order of the Court of Appeals, entered April 6, 2023 (Docket Nos. 360642; 360669).

## A. STANDARDS OF REVIEW

As defendant recognizes, her claim that the trial court erred by admitting Lieutenant Yech's testimony is unpreserved and is thus reviewed for plain error affecting substantial rights. See *People v Brown*, 326 Mich App 185, 195; 926 NW2d 879 (2018). Accordingly, to obtain appellate relief, defendant must show: (1) an error occurred, (2) the error was clear or obvious, and (3) the error affected substantial rights. *Carines*, 460 Mich at 763. To satisfy the third element, defendant must show that the error "affected the outcome of the lower court proceedings." *Id*. And even when those three requirements have been met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Allen*, 507 Mich 597, 614; 968 NW2d 532 (2021) (quotation marks and citations omitted).

Claims of ineffective assistance of counsel present mixed questions of fact and law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). Findings of fact are reviewed for clear error, while questions of law are reviewed de novo. *Id*. "The trial court's findings are clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016). "To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Id*. at 672. This Court presumes counsel was effective, and defendant carries a heavy burden to overcome this presumption. *Head*, 323 Mich App at 539. "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver (On Remand)*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019) (quotation marks and citation omitted). However, "a court cannot insulate the review of counsel's performance by calling it trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).

"The standards for 'plain error' review and ineffective assistance of counsel are distinct, and therefore, a defendant can obtain relief for ineffective assistance of counsel even if he or she cannot demonstrate plain error." *People v Hughes*, 506 Mich 512, 523; 958 NW2d 98 (2020).

## B. ANALYSIS

Drug-profile evidence is an informal collection of otherwise innocuous characteristics that are "often displayed by those trafficking in drugs." *People v Murray*, 234 Mich App 46, 52-53, 56; 593 NW2d 690 (1999) (quotation marks and citations omitted). "Such evidence is inherently prejudicial to [a] defendant" because it suggests that innocent characteristics may indicate criminal activity, and it cannot be used as substantive evidence of a defendant's guilt. *Id*. at 53, 57 (quotation marks and citations omitted). The prosecution, however, "may use expert testimony from police officers to aid the jury in understanding evidence in controlled substance cases," including "to explain the significance of items seized and the circumstances obtaining during the investigation of criminal activity." *Id*. at 53. As this Court has explained, expert testimony from an officer that the quantity and packaging of drugs found indicate an intent to distribute, rather than to personally use, the drugs is not considered to be impermissible drug-profile evidence, and

such testimony is not rendered inadmissible by the fact that it embraces the ultimate issue to be decided by the jury. *People v Ray*, 191 Mich App 706, 708; 479 NW2d 1 (1991) (holding that officer testimony that the quantity, form, and selling price of crack cocaine found in the defendant's possession "clearly indicated that [the] defendant intended to sell the drugs and not simply use the crack cocaine for personal consumption" was not rendered inadmissible even though it embraced the ultimate issue of intent to deliver); see also *People v Williams (After Remand)*, 198 Mich App 537, 542; 499 NW2d 404 (1993) (relying on *Ray* to hold that "the trial court did not abuse its discretion in admitting the officer's testimony" because "the testimony concerned how the evidence found in defendant's house was routinely used to cut, weigh, package, and sell controlled substances").

In this case, defendant contends that it was improper for Lieutenant Yech to testify that "the 23 individually packaged crack rocks" seized during the second search of the Pearl Street house were "for sales and distributions in [his] opinion." Defendant does not dispute Lieutenant Yech's qualification as an expert, and Lieutenant Yech explained that his expert opinion about the drugs was informed by their packaging, the location and circumstances in which they were found, and the digital scale and $2,234 in cash that were also found. This was not simply testimony about how "otherwise innocuous characteristics" fit a drug profile, but was instead about the nature and circumstances of the illicit drugs themselves; it fell within the scope of expert officer testimony that may be offered "to aid the jury in understanding evidence in controlled substance cases," including "to explain the significance of items seized and the circumstances obtaining during the investigation of criminal activity." *Murray*, 234 Mich App at 53. And, as this Court has made clear, the fact that such testimony embraced the ultimate issue of defendant's intent to deliver the crack cocaine in her possession did not render the testimony inadmissible. See *id*. at 54; *Ray*, 191 Mich App at 708; *Williams*, 198 Mich App at 542. Given this binding precedent, we do not see plain error in the admission of Lieutenant Yech's testimony regarding the drugs, or ineffectiveness of counsel in failing to object to it. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.").

Defendant also takes issue with Lieutenant Yech's testimony that it was common "to find mail with a different address on it" during a search for evidence of drug trafficking because it was common for individuals trafficking drugs to have mail sent somewhere other than their drug house. According to defendant, this constituted improper drug-profile testimony because it "compared [defendant's] characteristics to the profile of a drug dealer in such a way that guilt was necessarily implied." This piece of testimony presents a closer question than the last, in that the presence of mail at an address other than its mailing address is, by itself, a characteristic that "could apply equally to innocent individuals." *Murray*, 234 Mich App at 53. And while Lieutenant Yech did not opine that defendant was guilty based on this evidence, his testimony connected the profile characteristic to defendant's specific circumstances, and no specific limiting instruction was given to the jury about it. See *id*. at 56-57. That said, the testimony was based on specialized knowledge of drug sales, and it was meant to educate the jury about the modus operandi of drug dealers and to provide the jury with a better understanding of the evidence seized from the Pearl Street house. See *id*. at 54, 62. And as already discussed in detail, the prosecution most certainly offered "additional evidence from the case that the jury c[ould] use to draw an inference of criminality." *Id*. at 57. Finally, while no specific instruction was given to the jury regarding drug-profile evidence, the trial court instructed the jury regarding expert witnesses and police officers as

witnesses, informing the jury that it could assign its own weight and credibility to the testimony of the officer and Lieutenant Yech.

Ultimately, however, we need not determine whether this piece of testimony was inadmissible because, either way, we do not see grounds for relief on the basis of its admission. With respect to ineffective assistance, even if counsel were deficient by failing to object or request a limiting instruction, we cannot conclude "that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Shaw*, 315 Mich App at 672. As discussed, Lieutenant Yech's testimony was, at minimum, largely admissible under binding precedent, and there was significant other evidence of defendant's guilt. Given the strength of the remaining admitted evidence, any deficiency in counsel's performance as to this testimony does not warrant reversal.

Nor do we see grounds for relief under a plain-error standard of review. For the reasons discussed, to the extent there was an error in the handling of Lieutenant Yech's testimony, it was not, in our view, "plain" under the applicable legal standards. *Carines*, 460 Mich at 763. And given the strength of the other evidence of defendant's guilt, we cannot say that any such error was significant enough to "result[] in the conviction of an actually innocent defendant or . . . seriously affect[] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Allen*, 507 Mich at 614 (quotation marks and citations omitted).

## VI. SEARCH WARRANT

Defendant argues that there was insufficient probable cause to support the September 2020 search warrant because the affidavit for the search warrant failed to establish a sufficient nexus between the alleged criminal activity—specifically, drug trafficking—and the Pearl Street house.[11] According to defendant, the trial court plainly erred by not suppressing the evidence obtained as a result of the search warrant, and defense counsel was ineffective for failing to move to suppress the evidence obtained as a result of the search warrant. We disagree.

## A. STANDARDS OF REVIEW

This issue is unpreserved, and defendant's claims of error and ineffective assistance are correspondingly governed by the same standards set forth in Section V.A, *supra*.

---

[11] Defendant also raises a probable-cause challenge regarding the February 2021 search warrant on the same grounds but fails to provide this Court with a copy of the search warrant authorizing the search. Nor does the record contain a copy of the February 2021 search warrant. In her brief on appeal, defendant "assumes" that the February 2021 search warrant "substantively mirrors" the September 2020 search warrant and is therefore "equally defective," and she asks this Court to assume the same. We decline to do so. Defendant's appeal is limited to evidence and documents contained in the original record. See MCR 7.210(A). Furthermore, defendant's requested assumption would be of no help to her even if we were to adopt it, given that, for the reasons discussed above, we disagree with defendant's challenge to the September 2020 search warrant.

-13-

B. ANALYSIS

The United States and Michigan Constitutions protect individuals from unreasonable searches and seizures by the government. See US Const, Am IV; Const 1963, art 1, § 11. "[R]easonableness is always the touchstone of Fourth Amendment analysis," and while "a search warrant is not always required before searching or seizing a citizen's personal effects," "the general rule is that officers must obtain a warrant for a search to be reasonable under the Fourth Amendment." *Hughes*, 506 Mich at 524-525 (quotation marks and citations omitted). A search warrant may only be issued if probable cause exists to justify the search. US Const, Amend IV; Const 1963, art 1, § 11; MCL 780.651(1). "Probable cause to issue a search warrant exists if there is a substantial basis for inferring a fair probability that evidence of a crime exists in the stated place." *People v Brown*, 297 Mich App 670, 675; 825 NW2d 91 (2012). "The warrant shall either state the grounds or the probable or reasonable cause for its issuance or shall have attached to it a copy of the affidavit." MCL 780.654(2).

An affidavit provided in support of a search warrant "must contain facts within the knowledge of the affiant and not mere conclusions or beliefs." *People v James*, 327 Mich App 79, 91; 932 NW2d 248 (2019) (quotation marks and citation omitted). While an affiant "may not draw his or her own inferences" based solely on his or her experience, "the affiant's experience is relevant to the establishment of probable cause." *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009). Additionally, an "affidavit prepared on the basis of information provided to the affiant by an unnamed person must provide sufficient facts from which a magistrate could find that the information supplied was based on personal knowledge and that either the unnamed person was credible or that the information was reliable." *People v Echavarria*, 233 Mich App 356, 366-367; 592 NW2d 737 (1999); see also MCL 780.653. A probable-cause determination must be based on the facts presented to the judge or magistrate by oath or affirmation. *Waclawski*, 286 Mich App at 698; see also MCL 780.651.

When there is a challenge to the search warrant, the reviewing court must read the affidavit in support of the search warrant "in a common sense and realistic manner, not a crabbed or hypertechnical manner." *People v Mullen*, 282 Mich App 14, 27; 762 NW2d 170 (2008) (quotation marks and citations omitted). Accordingly, this Court looks to whether "a reasonably cautious person could have concluded that there was a substantial basis for the finding of probable cause to issue a search warrant." *Waclawski*, 286 Mich App at 699. Generally, "if a warrant is determined to be invalid because it lacked a probable-cause basis or was technically deficient in some other manner, any evidence seized pursuant to that warrant . . . is inadmissible as substantive evidence in related criminal proceedings." *People v Hellstrom*, 264 Mich App 187, 193; 690 NW2d 293 (2004). "A magistrate's finding of probable cause and his or her decision to issue a search warrant should be given great deference and only disturbed in limited circumstances." *People v Franklin*, 500 Mich 92, 101; 894 NW2d 561 (2017).

In this case, the affiant—a detective who had worked in law enforcement since 2006 and as a member of SWET since 2014—stated in the affidavit that he was informed by a confidential informant (CI) that, within the preceding 24 to 48 hours, the CI had seen Parson in the Pearl Street house with approximately seven grams of crack cocaine in his possession. The affiant stated that he believed that the information provided by the CI was credible and reliable because the CI had "prior experience in the sale and distribution of crack cocaine" and had provided credible and

reliable information to SWET for the preceding six months, all of which had led to SWET's seizure of evidence of drug trafficking in other cases. The affiant also stated that, based on his training as a police officer and his experience investigating numerous narcotics-trafficking cases, individuals who distribute illegal narcotics often keep the narcotics intended for sale in their own house because they are familiar with it and could ensure that they have "quick and easy access to the narcotics" and that "the narcotics will not be tampered with by anyone else but themselves." The affidavit indicated that, based on the information provided by the CI and the affiant's training and experience, the affiant believed that execution of a search warrant for the house on Pearl Street would "yield further evidence into illegal narcotics trafficking" by Parson or "any other occupant at this residence." A magistrate found that the affidavit had provided sufficient evidence to satisfy the probable-cause standard and issued a warrant allowing police officers to search the house on Pearl Street for—and seize, if found—evidence of any controlled substances; evidence of drug trafficking, such as books, records, receipts of drug-related transactions, scales, weight sets, and packaging material; and evidence of "[i]ndicia of occupancy, residency, rental, and/or ownership," such as keys to the house, utility bills, and purchase or lease agreements.

In challenging the search warrant and accompanying affidavit, defendant does not dispute the credibility of the CI or the reliability of the information provided to the affiant by the CI. Rather, in arguing that there was insufficient probable cause to support a search of the Pearl Street house for evidence of drug trafficking, defendant asserts that the CI's statement *itself*—that Parson possessed seven grams of crack cocaine in the house on Pearl Street—was insufficient. *People v Keller*, 479 Mich 467; 739 NW2d 505 (2007), is instructive on this issue.

At issue in *Keller* was a search warrant of the defendants' house that "authorize[d] the seizure of three categories of evidence: marijuana; distribution evidence, such as currency and packaging paraphernalia; and possession evidence, such as proof of residency." *Id*. at 479. The affidavit in support of the warrant contained facts regarding (1) an anonymous tip that the defendants were operating a marijuana growing and distribution operation out of their house, and (2) police officers' subsequent discovery of a "marijuana roach," marijuana residue on a pizza box, and bills connecting the defendants to the house in the defendants' trash bin. *Id*. at 470-471. This Court had concluded that the warrant and affidavit were insufficient to support a finding of probable cause and thus that any evidence obtained pursuant to the warrant had to be suppressed. *Id*. at 472, 476. Our Supreme Court, however, reversed that determination. *Id*. at 469, 484. The Supreme Court first noted that this Court failed to afford the magistrate's probable cause determination the "great deference" to which it is entitled from reviewing courts. *Id*. at 477 (quotation marks and citation omitted). It then explained that, while this Court fixated on the reliability of the source of the anonymous tip, that focus was misplaced "because, regardless of the veracity of the source, the officer participated in a trash pull that revealed evidence of marijuana and correspondence tying the trash to the defendants." *Id*. at 477. "The presence of marijuana in defendants' trash show[ed] a fair probability that contraband or evidence of a crime w[ould] be found in a particular place" and thus was enough in itself to "establish[] probable cause to search the house for additional contraband." *Id*. (quotation marks and citation omitted). Finally, the Court dismissed as "irrelevant" the dissent's argument that the scope of the warrant was unnecessarily broad by allowing officers to search for evidence of drug trafficking based just on the evidence of marijuana. *Id*. at 478. The Court explained that, even assuming this were true, the rule of severability provided that

the infirmity part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant, but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized—on plain view grounds, for example—during execution of the valid portions). [*Id*. (quotation marks, citations, alterations, and ellipsis omitted).]

The Court concluded that the "arguably invalid" portion of the warrant (which related to evidence of drug distribution) was severable from the valid portions of the warrant (which related to evidence of marijuana and "possession evidence, such as proof of residency") and "the scope of the search authorized by the valid portion of the search was extremely broad" because "the authorized search for marijuana permitted police officers to search the entire house and to investigate containers in which marijuana may have been found." *Id*. at 479-480.

Based on *Keller*, we conclude that, even assuming probable cause did not exist to search the Pearl Street house for evidence of drug trafficking, the affiant's attestations were sufficient to establish probable cause to search the house for drugs and proof of residency. The scope of the search authorized by the valid portions of the search warrant was broad and permitted police officers to search any place within the house in which drugs could have been found. See *id*. While the officers seized a firearm and some evidence of trafficking during the first search, all of the items were in plain view during the search and were therefore lawfully seized. See *id*. at 478.

Given that all of the evidence obtained during the September 2020 search was lawfully seized, defendant's argument that defense counsel was ineffective for failing to move to suppress the evidence fails, see *Ericksen*, 288 Mich App at 201, as does defendant's claim that the trial court plainly erred by failing to suppress the evidence, see *Carines*, 460 Mich at 763.[12]

## VII. CONCLUSION

For the reasons set forth above, we conclude that none of defendant's alleged errors require reversal.[13] We nonetheless remand this case to the trial court for the clerical correction of defendant's judgment of sentence in Docket No. 360642 to reflect that defendant was convicted of maintaining a drug house and for the clerical correction of defendant's judgment of sentence in Docket No. 360669 to reflect that defendant's felony-firearm sentence is to be served

---

[12] Defendant claims that cumulative effect of defense counsel's errors denied her the right to a fair trial. As discussed, however, the only arguable error in defense counsel's performance that defendant has identified does not warrant relief.

[13] Defendant also requests that we remand to a different judge if we remand for resentencing or an evidentiary hearing, but because defendant has failed to establish the necessity for either, we need not reach this request.

consecutively to her felon-in-possession sentence.[14]  See MCR 7.216(A)(7).  We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Kirsten Frank Kelly
/s/ Philip P. Mariani

---

[14] Because defendant's felony-firearm conviction was predicated only on her felon-in-possession conviction, defendant's felony-firearm sentence is still to be served concurrently with her convictions of PWID and keeping or maintaining a drug house in Docket No. 360642.  See *People v Coleman*, 327 Mich App 430, 441; 937 NW2d 372 (2019) ("A felony-firearm sentence must . . . be served consecutively with the sentence for the one predicate felony.").